UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X
ALICE ANN JUNG, et al.,              :
                                     :
                    Plaintiffs,      :
                                     : 01 Civ. 6993 (RMB)(THK)
         -against-                   :
                                     :    **REPORT AND**
JANET C. NESCHIS,                    :    **RECOMMENDATION**
ROBERT P. LITTMAN, et al.,           :
                                     :
                                     :
                    Defendants.      :
----------------------------------X
**FROM: THEODORE H. KATZ, UNITED STATES MAGISTRATE JUDGE.**
**TO: THE HON. RICHARD M. BERMAN, UNITED STATES DISTRICT JUDGE.**

This action was referred to me, pursuant to 28 U.S.C. § 636(b)(1)(B) and (C), for a Report and Recommendation with respect to Defendants' pending Motion to Dismiss the Complaint and Motion for Sanctions, both brought pursuant to Rule 37 of the Federal Rules of Civil Procedure ("Rule 37"), as a result of a series of alleged improprieties in Plaintiffs' conduct during the course of pretrial discovery. For the reasons that follow, I respectfully recommend that the Motion to Dismiss be denied, and that the Motion for Sanctions be granted. The Court's recommendation as to the specific relief warranted is set forth below.

## BACKGROUND

This action arises out of the probate of the estate of Mrs. Natasha Gelman ("Mrs. Gelman"). On July 30, 2001, Alice Ann Jung, the executrix of the estate of Miroslav Jung; Josef and Michelle Jung, her children; and Jaroslav Jung a/k/a Jerry Jung, her husband (collectively, the "Jungs" or, not including Jerry Jung,

"Plaintiffs"), relatives of Mrs. Gelman, filed the instant action against Defendants Janet Neschis ("Neschis"), Robert Littman ("Littman") and Marilyn G. Diamond ("Diamond") (collectively, "Defendants").   They alleged that Defendants exercised undue influence over Mrs. Gelman and conspired to defraud her, after she "had become mentally incompetent in the last years of her life," in order to "obtain control over Mrs. Gelman's substantial assets and divert them to [Defendants'] personal use and benefit." (Amended Complaint, dated Oct. 30, 2002, at P1.)   The history of this dispute is discussed in great detail in the Court's (Berman, J.) Opinion in <u>Weizmann v. Neschis</u>, 421 F. Supp. 2d 654 (S.D.N.Y. 2005),[1] addressing Defendants' motion for summary judgment and, in the alternative, motion to dismiss.   An excerpt of that Opinion provides the relevant background:

> Jacques and Natasha Gelman, a married couple with no children, amassed a large fortune, principally as a result of Mr. Gelman's successful career as an entertainment agent and film producer. In 1985, the Gelmans contributed a substantial portion of their assets to Anturia, a Liechtenstein "stiftung" or foundation, which was governed by a Charter, dated May 9, 1985.[2] KPMG Fides ("Fides") administered Anturia, and Anturia's funds were invested with Credit Suisse Trust ("Credit Suisse").  Based upon instructions from the Gelmans, the Anturia Board enacted by-laws from time to time, which

---

[1] The Weizmann Institute, another of the initial beneficiaries of the Gelman estate, was the plaintiff in a companion case to this one.  That case was eventually settled.

[2] Anturia is alleged to have held more than $36 million in assets as of June 1998. <u>See</u> <u>Weizmann</u>, 421 F. Supp. 2d at 664 n.6.

provided for the distribution of Anturia's assets upon
the death of the Gelmans.

. . .

After Mr. Gelman's death on July 23, 1986, Mrs. Gelman
instructed the Board to make several (sets of) changes to
Anturia's by-laws. That is, pursuant to her instructions,
the Board adopted by-laws, dated August 10, 1989 ("1989
By-laws"), which provided that, in the event of Mrs.
Gelman's death, Anturia's assets would be divided as
follows: (1) 20% to Weizmann; (2) 34% (collectively) to
the Jungs; and (3) 46% (collectively) to other named
charities and beneficiaries.  And, pursuant to Mrs.
Gelman's instructions, the Board adopted by-laws, dated
August 13, 1991 ("1991 By-laws"), which modified the
asset distributions as follows: (1) 20% to Weizmann; (2)
37% (collectively) to the Jungs; (3) 1% to Littman; and
(4) 42% (collectively) to other named charities and
beneficiaries.  Of principal significance here, on or
about October 19, 1992, new by-laws were adopted which
changed the asset distributions (to the disadvantage of
Plaintiffs) as follows: (1) reducing the Jungs'
allocation from 37% to 5% of Anturia's assets, (2)
increasing Littman's share from 1% to 31% of the assets,
(3) adding Diamond as a 3% beneficiary, (4) replacing all
charitable bequests (including bequests to Weizmann) with
a (single) gift of 57% of Anturia's assets to the
Testamentary Trust established under Mrs. Gelman's "New
York Last Will and Testament dated April 6, 1990, or any
later Last Will and Testament . . .," and (5) awarding a
total of 4% to five other non-charitable beneficiaries.

Plaintiffs claim that the 1989 By-laws and/or the 1991
By-laws "were the last by-laws executed in accordance
with Mrs. Gelman's instructions while Mrs. Gelman
remained of sound mind and free of duress and undue
influence," and that "some time in late 1991, Mrs. Gelman
began to suffer from Alzheimer's disease."  Plaintiffs
argue that, thereafter, and at a time when Mrs. Gelman
was no longer of sound mind, her attorney (Neschis) and
her art advisor (Littman) conspired to take advantage of
Mrs. Gelman by "fraudulently obtaining" the 1992 By-laws.

Id. at 663-65.

Essentially, Plaintiffs argue that changes to the beneficiary

3

provisions of the Anturia by-laws in 1992, requested by Mrs. Gelman
six years before she died in 1998, are invalid because they were
made as a result of undue influence by Defendants at a time when
Mrs. Gelman had Alzheimer's Disease, and thus lacked testamentary
capacity.  These allegations were also made in 1999, when the Jungs
filed Amended Objections to Probate in New York's Surrogate Court
— which they later withdrew — asserting that Mrs. Gelman's 1993 New
York will was invalid because she lacked testamentary capacity and
because the will was produced as a result of undue influence by
Neschis and Littman.  The allegations were again raised in 2000,
when the Jungs intervened in an arbitration in Liechtenstein
involving the issue of whether Mrs. Gelman lacked testamentary
capacity to amend the Anturia by-laws in 1992.  The arbitration had
been commenced against Anturia by Neschis and Diamond, as trustees
of the Jacques and Natasha Gelman Trust.  In a 53-page award, dated
June 8, 2001, the arbitrators held that the 1992 by-laws were
legally valid because, "at the time [Mrs. Gelman] signed her
instructions" directing their adoption, she "possessed testamentary
capacity" and was not "unduly influenced by a third-party."
Subsequently, the Surrogate's Court submitted the 1993 New York
will to probate.

On July 30, 2001, the Jungs commenced this action, and on
October 3, 2002, the Court (Berman, J.) granted in part and denied
in part Defendants' motion to dismiss on collateral estoppel

4

grounds.  The Jungs then filed their Amended Complaint on October 30, 2002, and on December 14, 2005, the Court granted in part and denied in part Defendants' renewed motion for summary judgment on the issue of the collateral estoppel effects of the Liechtenstein arbitration. See Weizmann, 421 F. Supp. 2d at 677, 680.  The Court held that, in the arbitration, "[the Jungs] were afforded 'a full and fair opportunity to adjudicate' the issue of Mrs. Gelman's testamentary capacity," id. at 680, and that the arbitration panel's finding that Mr. Gelman had testamentary capacity was "well reasoned and a careful marshaling and analysis of the evidence." Id. at 681.  The Court also found that "the issue of Mrs. Gelman's testamentary capacity was necessarily decided by the Arbitration Award," and, thus, "interests in finality demand that they not be given a second chance to raise the same issue here." Id. at 677.

However, the Court also held that Plaintiffs were not collaterally estopped from contending that the 1992 by-law changes were the result of undue influence.  The Court reasoned that "[a]lthough the Tribunal stated that Mrs. Gelman was not 'unduly influenced by a third party,' the Tribunal did not marshal supporting evidence (or law) for its finding."  The Court further noted that "[u]nder New York law . . . a finding of testamentary capacity does not necessarily preclude a finding of fraud or undue influence in the making of a will." Id. at 678 (citing In re Estate of Johnson, 6 A.D.3d 859, 861, 775 N.Y.S.2d 107, 109 (3d Dep't

2004))(internal citations omitted).

In pursuit of their undue influence claim, Plaintiffs obtained the expert opinion of Dr. Fred Plum ("Dr. Plum"), a neurologist, on the subject of whether Mrs. Gelman was suffering from Alzheimer's Disease when she amended the by-laws in 1992, presumably in support of the argument that she did not have independent will at that time.  Dr. Plum examined Mrs. Gelman once, on March 20, 1995.  His contemporaneous report, written on the basis of that examination, stated that Mrs. Gelman "appears to have progressive Alzheimer's Disease with a fairly typical pattern of memory loss," and that "the results of the present examination indicate that she lacks testamentary mental capacity." (Patient Note, dated Mar. 20, 1995 ("1995 Examination Report"), at 2.)  On December 10, 1999, Dr. Plum was deposed regarding his 1995 examination as part of the probate proceeding in Surrogate's Court:

> Q.  . . . Are you able to form an opinion as to whether [Mrs. Gelman] had testamentary capacity on April 23, 1993?
>
> A.  No.
>
>   . . .
>
> Q.  Is there an inquiry that you could make now which would permit you to express an opinion as to her capacity in April of 1993?
>
> A.  No.  I mean - I told this only once.  I observed these deficits in her mental capacities and I - and I did not - I did not have contact with her after that episode.

(Deposition of Dr. Plum, dated Dec. 10, 1999, Ex. 1 to Affidavit of

Jane Parver, Esq., dated Feb. 22, 2007 ("Parver Aff."), at 5-6.)

Despite his deposition testimony in 1999, on October 26, 2000, Dr. Plum executed an expert affidavit for submission to the Liechtenstein arbitrators, stating that he had been retained by Plaintiffs "to evaluate the mental condition of Natasha Gelman in the years preceding [his] clinical evaluation of her in March 1995." (Affidavit of Fred Plum, M.D., dated Oct. 26, 2000 ("2000 Affidavit" or "2000 Opinion"), Ex. 3 to Parver Aff., ¶ 1.)  Based on his review of "a series of affidavits and other evidence that detailed numerous specific incidents of behavior in the years preceding [his] March, 1995 clinical evaluation," Dr. Plum summarized his findings as follows: "Mrs. Gelman was suffering from late stage, severe disability of typical Alzheimer's type and lacked capacity by early 1992, if not earlier." (2000 Opinion ¶ 2.)

By a letter dated April 3, 2006, Plaintiffs provided Defendants with a copy of Dr. Plum's 2000 Affidavit, stating that it was the expert report "upon which the Jungs intend to rely" in this case, and on April 27, 2006, they provided what they characterized as "Plaintiffs' expert report," consisting of a short affidavit from Dr. Plum in which he affirmed that his 1995 Examination Report reflected his findings at that time, and reaffirmed the statements contained in his 2000 Affidavit. (See Affidavit of Fred Plum, M.D., dated Apr. 27, 2006 ("2006 Affidavit"), Ex. 9 to Parver Aff., ¶¶ 4-5.)

It is a series of events relating to these documents, and Plaintiffs' intent to use Dr. Plum as an expert in this case, that give rise to the instant motions for dismissal and sanctions pursuant to Rule 37.  Defendants cite four bases for the relief requested: 1) Plaintiffs' failure to disclose the fact that Dr. Plum himself had Alzheimer's Disease and was no longer competent to be deposed, or render an expert opinion in this case; 2) Plaintiffs' submission of Dr. Plum's 2006 Opinion, which allegedly contained several false representations; 3) Plaintiffs' failure to disclose that some of the information on which Dr. Plum purportedly relied was not actually obtained from Dr. Plum; and 4) Plaintiffs' production of altered copies of tape recordings made by Jerry Jung of conversations he had with Mrs. Gelman, which Plaintiffs had previously represented were originals that had not been edited or altered. (See Defendants' Memorandum of Law in Support of Motion for Dismissal and Sanctions, dated Feb. 22, 2007 ("Def. Mem."), at 1-2.)  Defendants view these misrepresentations as evidence of Plaintiffs' bad faith, and argue that on the basis of the significant prejudice Defendants have suffered as a result of Plaintiffs' violations of their discovery obligations, the action should be dismissed, with sanctions levied against Plaintiffs. (See id. at 2.)

Plaintiffs respond by arguing that any nondisclosures were "substantially justified or harmless," and that there has been no

showing of bad faith that warrants dismissal. (See Plaintiffs'
Memorandum of Law in Opposition to Defendants' Motion for Dismissal
and Sanctions, dated Mar. 30, 2007 ("Pl. Opp. Mem."), at 6, 8.)
Specifically, in addressing each of Defendants' contentions of bad
faith, they state 1) that they were not aware of any deterioration
in Dr. Plum's condition at the time of their initial conversations
with him regarding his 2006 Affidavit, and that they promptly
informed Defendants upon learning that his condition had rapidly
deteriorated to the point that he was no longer able to testify,
(see id. at 6-7); 2) that the inaccuracies in Dr. Plum's curriculum
vitae were inadvertent, and entirely harmless, since there is no
question that Dr. Plum has long been a highly-regarded neurologist,
(see id. at 7); and 3) that with regard to the tapes, Jerry Jung
provided all of the tape recordings of conversations with Mrs.
Gelman to Defendants, including those upon which Dr. Plum relied,
and he submitted an additional affidavit reiterating that the tapes
"were never edited, altered or tampered with in any way," as
confirmed by a forensic expert who has reviewed the tapes and
states that he would submit an opinion to that effect. (See id. at
8.)

In addition, as part of their response to Defendants' motion,
Plaintiffs seek permission to substitute Dr. Alan Segal, a
neurologist, and Dr. Bennett Blum, a specialist in forensic and
geriatric psychiatry, as experts to replace Dr. Plum. (See id. at

1-3.)   Plaintiffs concede that their claim of undue influence depends on expert testimony, and that, as a result of Dr. Plum's unfortunate condition, an opportunity to present new experts is warranted.  Relying in part on affidavits submitted by Drs. Segal and Blum, in which they each state that they could render an opinion as to Mrs. Gelman's mental condition prior to 1995, based on the Examination Report and 2000 and 2006 Affidavits of Dr. Plum, and without having examined the subject themselves, Plaintiffs argue that Drs. Segal and Blum satisfy the requirements of the Federal Rules of Civil Procedure regarding the admissibility of expert testimony. (See id. at 1-5.)   Defendants respond that Plaintiffs should not be allowed to substitute new experts because the testimony of any new expert, necessarily relying upon the examination and affidavits of Dr. Plum, would be inadmissible. (See Defendants' Reply Memorandum of Law in Support of Motion for Dismissal and Sanctions, dated Apr. 16, 2006 ("Def. Reply Mem."), at 1-5.)   Defendants appear to also argue that allowing further expert testimony at this late stage would be prejudicial, as they have already expended significant resources in preparing their expert reports rebutting Dr. Plum's opinion, which were submitted in December 2006. (See id. at 10.)

Defendants base their requests for dismissal and sanctions on two provisions of the Federal Rules of Civil Procedure.  They first argue for dismissal pursuant to Rule 37(c), because of Plaintiffs'

failure to make satisfactory disclosures with regard to Dr. Plum's expert report, as required by Rule 26(a) of the Federal Rules of Civil Procedure. (See Def. Mem., at 15-22.)  They next argue for sanctions, including dismissal, pursuant to Rule 37(d), for Plaintiffs' production of allegedly altered tape recordings, represented as being unaltered originals. (See id. at 22-24.)  The Court will consider each of these arguments in turn, and then Plaintiffs' request to substitute new experts to replace Dr. Plum.[3]

**DISCUSSION**

I.    Motion for Dismissal and Sanctions Pursuant to Rules 37(c) and
      37(d)

---

[3] Defendants also reference, in passing, the Court's inherent power to impose sanctions, including dismissal, and the availability of such sanctions in cases where the court determines that a party has committed a "fraud upon the court." (See, e.g., Def. Mem., at 23, 24, 25.)  The factors relevant in considering whether to impose sanctions, and to what degree, are similar, both when a court is considering Rule 37 violations or a theory of fraud upon the court, and when a court is acting subject to its inherent authority or pursuant to Rule 37. See McMunn v. Memorial Sloan-Kettering Cancer Ctr., 191 F. Supp. 2d 440, 442 n.3 (S.D.N.Y. 2002) (noting that the court would "analogize to cases considering dismissal under Rule 37 to distill appropriate standards for dismissal pursuant to a fraud upon the court theory"); Barsoum v. NYC Housing Authority, 202 F.R.D. 396, 399 n.3 (S.D.N.Y. 2001) ("The considerations to be applied in determining whether to impose sanctions are the same whether the court is proceeding under Rules 37(d) . . . or under its inherent authority." (internal citations omitted)).  As a result, the Court will not consider sanctions for fraud upon the court, based on its inherent authority to impose sanctions, separate from its analysis under Rule 37.  In addition, cases from both lines of cases will be cited interchangeably. See Barsoum, 202 F.R.D. at 399 n.3.

11

A.   Relevant Law

Rule 37(c) of the Federal Rules of Civil Procedure, which "governs the imposition of sanctions when a party's conduct does not violate a specific court order," Communispond, Inc. v. Kelley, No. 96 Civ. 1487 (DC), 1998 WL 473951, at *4 (S.D.N.Y. Aug. 11, 1998), provides as follows:

> A party that without substantial justification fails to disclose information required by Rule 26(a) . . . is not, unless such failure is harmless, permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed. In addition or in lieu of this sanction, the court, on motion and after affording an opportunity to be heard, may impose other appropriate sanctions. In addition to requiring payment of reasonable expenses, including attorney's fees, caused by the failure, these sanctions may include any of the actions authorized under Rule 37(b)(2)(A), (B), and (C) . . .

> Fed. R. Civ. P. 37(c).

> Rule 37(d) provides, in relevant part, as follows:

> If a party . . . fails . . . to serve answers or objections to interrogatories submitted under Rule 33, after proper service of the interrogatories, or . . . to serve a written response to a request for inspection submitted under Rule 34, after proper service of the request, the court in which the action is pending on motion may make such orders in regard to the failure as are just, and among others it may take any action authorized under subparagraphs (A), (B), and (C) of subdivision (b)(2) of this rule. . . . In lieu of any order or in addition thereto, the court shall require the party failing to act or the attorney advising that party or both to pay the reasonable expenses, including attorney's fees, caused by the failure unless the court finds that the failure was substantially justified or that other circumstances make an award of expenses unjust.

> Fed. R. Civ. P. 37(d).

Thus, when a party fails to meet its discovery obligations or to comply with discovery orders, pursuant to Rules 37(c) and (d), the court may make such orders as are just, including orders of dismissal, default and preclusion.

    1.  <u>Dismissal</u>

Rule 37(b)(2)(C) of the Federal Rules of Civil Procedure, expressly authorized as a source of available remedies for certain violations of Rules 37(c) and (d), grants courts discretion to "dismiss[] the action."  There is no question that dismissal is a drastic sanction, which should be imposed sparingly. <u>See</u> <u>National Hockey League v. Metropolitan Hockey Club</u>, 427 U.S. 639, 643, 96 S. Ct. 2778, 2781 (1976) (per curiam); <u>Valentine v. Museum of Modern Art</u>, 29 F.3d 47, 49-50 (2d Cir. 1994) (per curiam) (in considering dismissal pursuant to Rule 37, stating that "[d]ismissal with prejudice is a harsh remedy to be used only in extreme situations . . . .") (internal citations omitted); <u>Civil v. New York City Dep't of Corrections</u>, No. 91 Civ. 2946 (SS), 1993 WL 51156, at *2 (S.D.N.Y. Feb. 23, 1993) (same).  Nevertheless, where lesser sanctions would not be meaningful and the plaintiff's misconduct is due to "willfulness, bad faith, or any fault," dismissal of an action is appropriate, <u>National Hockey League</u>, 427 U.S. at 640, 643, 96 S. Ct. at 2779, 2781; <u>Simmons v. Abruzzo</u>, 49 F.3d 83, 88 (2d Cir. 1995), provided that the plaintiff has been advised as to the consequences of its misconduct, <u>Simmons</u>, 49 F.3d at 88;

Valentine, 29 F.3d at 50; Bobal v. Rensselaer Polytechnic Inst.,
916 F.2d 759, 764 (2d Cir. 1990), cert. denied, 499 U.S. 943, 111
S. Ct. 1404 (1991).

Courts consider five factors in determining whether to impose
the sanction of dismissal:

> [1] the duration of the plaintiff's failures, [2] whether
> plaintiff had received notice that further delays would
> result in dismissal, [3] whether the defendant is likely
> to be prejudiced by further delay, [4] whether the
> district judge has taken care to strike the balance
> between alleviating court calendar congestion and
> protecting a party's right to due process and a fair
> chance to be heard, and [5] whether the judge has
> adequately assessed the efficacy of lesser sanctions.

Dodson v. Runyon, 86 F.3d 37, 40 (2d Cir. 1996) (citing factors in
Rule 41 context for entry of a default judgment) (internal
citations omitted); see also New Pac. Overseas Group (USA) Inc. v.
Excal Int'l Dev. Corp., Nos. 99 Civ. 2436 & 3581 (DLC), 2000 WL
377513, at *7 (S.D.N.Y. Apr. 12, 2000) (citing factors in Rule 37
context).

### 2.  Preclusion

While preclusion, too, is a harsh remedy, courts consider the
following factors in assessing whether it may be an appropriate
remedy for a failure to provide discovery:

> (1) the party's explanation for the failure to comply
> with the discovery order; (2) the importance of the
> testimony of the precluded witness [or of the precluded
> evidence]; (3) the prejudice suffered by the opposing
> party as a result of having to prepare to meet the new
> testimony [or evidence]; and (4) the possibility of a
> continuance.

14

Reilly v Natwest Markets Group Inc., 181 F.3d 253, 269 (2d Cir. 1999) (quoting Softel v. Dragon Medical and Scientific Communications, Inc., 118 F.3d 955, 961 (2d Cir. 1997)); see also Outley v. City of New York, 837 F.2d 587, 590-91 (2d Cir. 1988).

B.   Analysis

1.   Dismissal Pursuant to Rule 37(c)

Defendants argue for dismissal based on misrepresentations associated with the expert opinion of Dr. Plum.  First, they argue that he made false representations in his 2006 Affidavit and attached curriculum vitae (which they insinuate was drafted by Plaintiffs' counsel).  Specifically, they state that Dr. Plum's affidavit states that he is "licensed to practice medicine in the State of New York," and that he maintains offices at the Neurology and Neuroscience Department of the Weill Cornell Medical College, when, in fact, 1) he has not been licensed to practice since December 31, 2003, 2) since 2005 his office has not been located at the Medical College, and 3) his curriculum vitae states that he is a professor in the Department of Neurology, when, in fact, he has been an emeritus professor since 2003. (See Def. Mem., at 12, 17-18.)

Plaintiffs do not question the existence of the discrepancies identified by Defendants, arguing instead that the errors are both inadvertent and harmless, as, despite the errors, "[t]here is no question that Dr. Plum is a highly regarded neurologist." (Pl. Opp.

15

Mem., at 7.)   Plaintiffs' proposed new experts confirm this assessment. (See Affidavit of Dr. Segal, dated Mar. 23, 2007 ("Segal Aff."), Ex. C to Affidavit of John R. Horan, Esq., dated Mar. 30, 2007 ("Horan Aff."), ¶ 5 ("I can attest to [Dr. Plum's] preeminence in our field of neurology."); Affidavit of Dr. Blum, dated Mar. 21, 2007 ("Blum Aff."), Ex. D to Horan Aff., ¶ 5 ("I am aware of Dr. Plum's reputation.").)

Second, Defendants argue that Plaintiffs failed to promptly disclose, and attempted to conceal, that Dr. Plum himself suffers from Alzheimer's Disease, as a result of which he is not competent to testify or be deposed. (See Def. Mem., at 17.)   The following timeline of events is presented by Defendants and is uncontested by Plaintiffs.   On April 3, 2006, Plaintiffs identified Dr. Plum as their sole expert, to testify as to Natasha Gelman's mental condition, and provided Defendants with a copy of Dr. Plum's 2000 Affidavit, to be used as their expert report in this case.   On April 27, 2006, Plaintiffs supplemented their previous expert production by submitting a short affidavit from Dr. Plum, in which he essentially affirmed his 1995 Examination Report and 2000 Affidavit.  Various other discovery matters were addressed over the next several months, but on December 13, 2006, Defendants requested dates to conduct Dr. Plum's deposition, and on December 27, 2006, Plaintiffs' counsel provided deposition dates. (See Parver Aff. ¶ 18.)   On January 3, 2007, Defendants' counsel requested additional

16

dates in January or February, and on January 9, 2007, Defendants' counsel followed up regarding dates for Dr. Plum's deposition. At that time, Plaintiffs' counsel informed Defendants for the first time that Dr. Plum, now 83 years old, suffered from Alzheimer's Disease and would not be able to testify. (See id.) In follow-up letters, Plaintiffs stated that "our expert witness's illness incapacitates him. That is the sum of it . . . . We will soon be preparing a new expert to testify in his place." (Letter from John R. Horan, Esq., dated Feb. 2, 2007, Ex. 20 to Parver Aff.)

In his response to Defendants' motion, Plaintiffs' counsel states that when he first met Dr. Plum on January 29, 2006, and when he later visited him on April 27, 2006, he had no indication of any impairments to Dr. Plum's mental condition, or that Dr. Plum would not be able to recall details regarding Mrs. Gelman. However, by December 2006, Dr. Plum's condition had "declined so precipitously" that counsel eventually "lost contact with him entirely." (Horan Aff. ¶ 18.) Plaintiffs' counsel reiterates that he "was not trying to mislead counsel for defendants." (Id.)

Third, Defendants contend that Plaintiffs failed to comply with their disclosure requirements under Rule 26(a) of the Federal Rules of Civil Procedure ("Rule 26(a)"), by initially failing to provide the information upon which Dr. Plum relied in forming his opinion, and later, in December 2006, providing a set of documents upon which Dr. Plum allegedly relied, but failing to reveal that

the documents themselves were not provided by Dr. Plum.  Defendants were later able to independently establish that the documents were not obtained from Dr. Plum, since the only document he maintained since 2005, relating to Mrs. Gelman's case, was his 1995 Examination Report. (See Affidavit of Andrew K. Solow, dated Feb. 21, 2007 ("Solow Aff."), ¶ 5; E-mails from Susan Reither to Andrew Solow, attached as Ex. B to Solow Aff.; see also Affidavit of Susan Reither, dated Mar. 22, 2007 ("Reither Aff."), Ex. A to Horan Aff., ¶ 6.)  Moreover, Dr. Plum's 2000 Opinion, incorporated in his 2006 Affidavit, indicated that it also relied in part on "transcripts of telephone conversations between Mrs. Gelman and Mr. Jung." However, as discussed in more detail in Part I.B.2, infra, no tapes or transcripts were provided with the 2006 Affidavit in April. Although the tapes that were allegedly relied upon by Dr. Plum were finally produced in December, Defendants argue that there is significant evidence that the specific tapes represented by Plaintiffs to be those that Dr. Plum reviewed were not in fact the tapes upon which Dr. Plum relied. (See Def. Mem., at 10-11.)

Plaintiffs provide little by way of a response, apparently satisfied with the fact that the documents and tapes, purportedly the information relied upon by Dr. Plum, were eventually turned over to Defendants.  They do not contest the fact that Dr. Plum had not maintained any documents relating to Mrs. Gelman since at least 2005, with the exception of the 1995 Examination Report. (See

Reither Aff. ¶ 6.)  The only response to Defendants' concerns about whether the information provided was actually relied upon by Dr. Plum is contained in Plaintiffs' counsel's affidavit in opposition to the instant motion, in which he states, "on or about December 13, 2006, after consultation with Jerry Jung who knew what had been submitted to Dr. Plum, I delivered to counsel a binder of material prepared by Henry Gradstein, the Jungs' former counsel, most of which was known to counsel from prior proceedings, and which had been given me [sic] by Jerry Jung who told me that this had been prepared for Dr. Plum in the Surrogates' Court proceeding." (Horan Aff. ¶ 9.)

The Court finds that the alleged transgressions described above fail to establish Plaintiffs' "flagrant bad faith" or their counsel's "callous disregard" of his responsibilities, so as to warrant dismissal. See National Hockey League, 427 U.S. at 643, 96 S. Ct. at 2781.  With respect to the inconsistencies in Dr. Plum's curriculum vitae, the Court finds them to be rather minor, and there is no evidence that these errors were made intentionally, or with the intent to deceive.  Instead, the Court finds it hard to infer bad faith from the fact that someone with as long and distinguished a career as Dr. Plum may not have, at age 80, updated his curriculum vitae to reflect a change in address or official title (from "professor" to "professor emeritus").  In any event, the appropriate remedy for inconsistencies such as those alleged

here would be impeachment of the witness, not dismissal.

With regard to the alleged failure to disclose Dr. Plum's condition, thereby causing Defendants to incur significant costs in preparing to depose Dr. Plum and prepare rebuttal expert reports, the Court again finds that Defendants fail to demonstrate the requisite bad faith to warrant dismissal.  There is no doubt that Defendants have been inconvenienced; however, they have not submitted evidence to suggest that Plaintiffs were intentionally hiding the fact that Dr. Plum was unable to testify.  Indeed, in her sworn affidavit, Ms. Susan Reither, who has been Dr. Plum's administrative assistant since 1999, states that "[a]t the time [Dr. Plum] signed his reaffirmation of April 27, 2006 . . . he could focus on Natasha Gelman's case and knew what he had found in his examination of her and could converse about it," but that "[t]his he can no longer do." (See Reither Aff. ¶ 8.)  According to Ms. Reither, "[h]is failings seem to have progressed more rapidly since December, 2006." (Id.)  Plaintiffs' counsel informed Defendants of Dr. Plum's condition in early January, within a month of when Ms. Reither, who had known Dr. Plum for nearly eight years at that point, observed his condition deteriorating more precipitously.  In addition, in light of the fact that the parties were discussing dates for the deposition of Dr. Plum for only the second time, and only a month after Defendants first requested deposition dates, Plaintiffs' conduct can hardly be characterized

as deceptive or dilatory.  As such, Defendants have not established the requisite bad faith to warrant the harsh sanction of dismissal, particularly where less severe, but more tailored, sanctions are available, such as requiring Plaintiffs to bear the costs incurred by Defendants in securing an expert report that is no longer relevant.

With regard to Defendants' third claim, the Court finds Plaintiffs' conduct more disturbing.  Rule 26(a) states, in relevant part, that any witness "who is retained . . . to provide expert testimony in the case" must include a written report "that shall contain a complete statement of all opinions to be expressed and the basis and reasons therefor; the data or other information considered by the witness in forming the opinions; [and] any exhibits to be used as a summary of or support for the opinions . . . ." Fed. R. Civ. P. 26(a)(2)(B).  After submitting Dr. Plum's 2006 expert affidavit in April, attaching his 2000 Affidavit and 1995 Examination Report, Plaintiffs failed to submit any of the other information relied upon by Dr. Plum until December 13, 2006.  Suspiciously, this occurred two days after Defendants submitted their "rebuttal" expert reports refuting Dr. Plum's conclusion that Mrs. Gelman suffered from late-stage, severe Alzheimer's by early 1992.  Moreover, Plaintiffs' submission of the information allegedly relied upon by Dr. Plum was incomplete and misleading. It did not include copies of the tapes relied upon by Dr. Plum, and

did not make clear that the information Dr. Plum purportedly relied upon had been obtained not from Dr. Plum, but was based on information provided by Jerry Jung.[4]

The Court is not persuaded that these circumstances warrant dismissal. As an initial matter, while Rule 37(c) allows for the possibility of dismissal as a sanction even where a party's conduct does not violate a specific court order, see Communispond, 1998 WL 473951, at *4, courts considering dismissal usually do so in the context of intentional violations of direct court orders. See McMunn, 191 F. Supp. 2d at 442 n.2 (citing cases for proposition that dismissal would be inappropriate where, despite a "clear pattern of misconduct," it did not take the form of "repeated and flagrant defiance of clear discovery orders . . . that characterizes many Rule 37 dismissal cases"). Indeed, Defendants cite no caselaw supporting the sanction of dismissal pursuant to Rule 37(c) under circumstances similar to those presented here, in which Plaintiffs have not violated any express orders of this Court. More importantly, as discussed in further detail below, the Court finds that lesser sanctions are available to sufficiently address Plaintiffs' misconduct and compensate Defendants for the prejudice they have suffered. See Barsoum, 202 F.R.D. at 400 (in

---

[4] While Jerry Jung is a non-party in this action, he is very much an interested party. He is the husband of Plaintiff Alice Jung. In fact, he was originally a named Plaintiff in this action, but later dismissed for lack of standing. See Weizmann, 421 F. Supp. 2d at 673.

considering whether to award sanctions pursuant to Rule 37, noting that "[u]sually dismissal should be imposed only after considering less drastic alternatives"); see also McMunn, 191 F. Supp. 2d at 462 (considering "the feasibility and effectiveness of lesser sanctions" before "reaching the conclusion that dismissal is the proper remedy").  Defendants' request for dismissal pursuant to Rule 37(c) should therefore be denied.

        2.   Dismissal Pursuant to Rule 37(d)

        Defendants also seek dismissal, and lesser sanctions, based on allegations that Plaintiffs produced in discovery altered tape recordings of three conversations between Jerry Jung and Mrs. Gelman, which were purportedly relied upon by Dr. Plum in rendering his opinion of Mrs. Gelman's mental condition in 1992, and, without any basis in fact, Plaintiffs made false assertions as to which tapes Dr. Plum relied upon. (See Def. Mem., at 22-23.)  In support of their allegations, Defendants rely on the opinion of Thomas Owen, an audio expert.  Owen reviewed tape recordings made by Jerry Jung of three telephone conversations, which Plaintiffs represented were original recordings, and concluded "to a reasonable degree of scientific certainty that these tapes are not authentic originals and have been tampered with." (Affidavit of Thomas J. Owen, dated Feb. 21, 2007 ("Owen Aff."), ¶ 7.)  Plaintiffs respond that the tapes in question are only three of twenty-seven tapes produced, and that the three tapes tested are not even the three tapes that

23

were reviewed by Dr. Plum at the time of his 2000 Affidavit. (See Pl. Opp. Mem., at 8.)  Moreover, Plaintiffs dispute Mr. Owen's opinion that the tapes he reviewed were altered. (See id.)  In support, Plaintiffs present the affidavit of Jerry Jung, providing a detailed account of how and when each of the relevant tapes were produced, and reiterating that the tapes were never altered or tampered with, (see Affidavit of Jaroslav Jung, dated Mar. 22, 2007 ("Jung Aff."), ¶ 5), as well as a report from their own expert, James B. Reames, a former FBI agent and forensic expert, opining that, based on his preliminary analysis of one of the three tapes provided to Defendants, he "ha[d] not detected evidence of editing or alteration." (See Report of James B. Reames, dated Mar. 29, 2007 ("Reames Report"), at 4.)

According to Jerry Jung, in approximately 1985, he began taping "important" telephone conversations with family members, including his conversations with Natasha Gelman. (See Jung Aff. ¶ 4.)  In total, twenty-seven tapes were produced, primarily of conversations with Mrs. Gelman, which occurred during the crucial period from 1992 - 1994. (See id. ¶ 5.)  In Dr. Plum's 2000 Affidavit, opining that Mrs. Gelman "was suffering from late stage, severe disability of typical Alzheimer's type and lacked testamentary capacity by early 1992, if not earlier," he relied upon his 1995 examination of Mrs. Gelman (and associated Examination Report), as well as "a series of affidavits and other

evidence that detailed numerous specific incidents of behavior in the years preceding [his] March, 1995 clinical evaluation." (Plum 2000 Aff. ¶ 2.)   The "other evidence" relied upon by Dr. Plum apparently included "transcripts of telephone conversations between Mrs. Gelman and Mr. Jung," which Dr. Plum found to "confer [sic] that [Mrs. Gelman] was plainly delusional." (Id. ¶ 41.)   However, neither Dr. Plum's 2000 Opinion, nor his 2006 Affidavit, nor any other document, identify 1) the specific taped conversations for which he saw transcripts, 2) when the underlying telephone conversations occurred, or 3) how many such transcripts he actually reviewed.

On March 3, 2006, Defendants served Plaintiffs with a Second Request for Production of Documents that sought all audio recordings of Natasha Gelman. (See Ex. 21 to Parver Aff., Resp. No. 13.)   In response, on July 13, 2006, Plaintiffs' counsel produced the twenty-seven tapes recorded by Jerry Jung.   Defendants subsequently advised Plaintiffs' counsel that they intended to have an expert analyze Tapes 4, 5, and 9, and requested that Plaintiffs produce the originals of those tapes for that purpose. (See Letter from Paul J. Curran, Esq., dated July 13, 2006, Ex. 22 to Parver Aff.)   On September 29, 2006, Plaintiffs' counsel produced two tapes to Defendants' audio expert, Mr. Owen, stating that they were "two original tape recordings containing Tapes 4, 5, and 9, belonging to my client Jerry Jung." (Letter from John R. Horan,

dated Sept. 29, 2006, Ex. B to Owen Aff.)  Although neither the originals nor the previously-produced copies of the tapes contain any means of identifying the actual dates of the recordings, Plaintiffs represented that the conversations were between Mr. Jung and Mrs. Gelman on December 19, 1992 (Tape 4), January 13, 1993 (Tape 5), and October 19, 1994 (Tape 9). (<u>See</u> Owen Aff. ¶¶ 2, 3.) Subsequently, on December 11, 2006, Mr. Owen issued an expert opinion stating his belief that the three telephone conversations, represented to be originals, in fact "[we]re not authentic originals and ha[d] been tampered with." (Owen Aff. ¶ 7.)  Two days later, on December 13, 2006, Plaintiffs finally produced the information allegedly relied upon by Dr. Plum in forming his opinion of Mrs. Gelman's mental condition, and on the same day, under separate cover, delivered a package containing transcripts of Tapes 6, 11, and 14.  Plaintiffs' counsel's accompanying letter characterized the transcripts as those that were relied upon by Dr. Plum in forming his 2000 Opinion. (<u>See</u> Letter from John R. Horan, Esq., dated Dec. 13, 2006, Ex. 15 to Parver Aff.)  The letter did not explain from whom the transcripts had been obtained, or how it had been established that they were the transcripts upon which Dr. Plum had relied.

The Court finds Plaintiffs' conduct troubling.  Eight months after Dr. Plum submitted his 2006 Affidavit, and two days after Defendants produced an expert report opining that Tapes 4, 5 and 9

26

were not authentic, Plaintiffs produced transcripts of three other tapes — numbers 6, 11, and 14 —  that they described, rather conveniently, as the taped information upon which Dr. Plum relied. However, Plaintiffs had never previously, in the course of this protracted litigation, identified Tapes 6, 11 and 14 as the tapes Dr. Plum relied upon.  In fact, there is ample evidence to the contrary, suggesting that Tapes 4 and 5 were at least part of the group of tapes Dr. Plum reviewed.  First, Plaintiffs submitted transcripts or recordings for Tapes 4, 5 and 13 to the Liechtenstein Arbitration Tribunal, which were admitted in evidence and considered as part of that proceeding. (See Award in Arbitration, Ex. 4 to Parver Aff., at 12, 20 (identifying the tapes and transcripts by the dates of conversation); Letter from John R. Horan, Esq., dated Mar. 23, 2006, Ex. 25 to Parver Aff., at 1 (identifying the number of each tape based on the date of conversation).)   Moreover, Plaintiffs themselves stated, in a document entitled "The Jung family's answer to the arbitrator's findings," that "Dr. Plum reviewed a mountain of evidence from 1991 (including Natasha's own voice in [a] 1992 tape)." (Ex. 24 to Parver Aff., at 2.)  The only tape from 1992, based on Plaintiffs own representation as to the dates of the recordings, is Tape 4. Thus, if one was to attempt to infer which tapes Dr. Plum reviewed in forming his 2000 Opinion, there is at least some evidence that, at the time of the Liechtenstein arbitration, Plaintiffs took the

27

position that Dr. Plum had considered Tapes 4, 5 and 13.

On the other hand, the only evidence suggesting that Dr. Plum relied upon Tapes 6, 11 and 14 is Plaintiffs' recent statement asserting as much. However, they provide no substantiation for their suspiciously-timed statement. Defendants established, on their own, that no tapes or transcripts were obtained from Dr. Plum, since he no longer maintained any files related to Mrs. Gelman, besides his 1995 Examination Report. Meanwhile, Plaintiffs only revealed that the tapes were obtained from Jerry Jung in their response to the instant motion, in which Plaintiffs' counsel communicated in his affidavit that "Jerry Jung informed me that those tapes referred to by Dr. Plum were 6, 11 and 14." (Horan Aff. ¶ 10.) Amazingly, Jerry Jung's own affidavit, submitted in opposition to the instant motion, does not state that Dr. Plum relied upon Tapes 6, 11 and 14, or provide any guidance regarding which tapes he considered.[5] Even if he had done so, it is questionable that his assertions could be viewed as competent evidence of what Dr. Plum relied upon in forming his opinion.

The Court views Plaintiffs' contorted positions on these matters with great suspicion and gives no weight to Plaintiffs' contentions on the issue of which tapes Dr. Plum relied upon.

_____

[5] Jerry Jung's affidavit is dedicated almost entirely to proving the veracity of the dates associated with the tapes, by detailing the surrounding context in which the tapes were recorded. He does this for Tapes 4, 5, and 9, and, for whatever reason, Tapes 12 and 13. (See Jung Aff.)

28

Nevertheless, it does not find that dismissal would be the appropriate sanction. As an initial matter, the circumstances presented by this case are rather bizarre, and the unfortunate circumstances involving Dr. Plum's health are generally damaging to Plaintiffs' case. Although Plaintiffs could have dealt with the circumstances surrounding Dr. Plum differently, they are not principally at fault for Dr. Plum's inability to be deposed and testify, or the fact that he discarded his old files when he moved out of his office at the Weill Cornell Medical Center in 2005. While Plaintiffs' subsequent conduct has been less than forthright, warranting sanctions in some form, this is not a case in which Plaintiffs themselves have actively flouted court orders or made clear attempts to deceive the Court and opposing counsel.[6] Furthermore, it is not entirely clear at this point that the tapes produced to Defendants were altered; in response to Defendants' expert affidavit opining that the tapes are not originals, Plaintiffs have proffered the testimony of their own expert, who opines that his preliminary assessment of one of the tapes reveals no evidence of editing. (See Ex. E to Horan Aff.) Finally, all of the confusion about the tapes and what Dr. Plum relied on has become largely irrelevant, as Dr. Plum can no longer serve as

---

[6] Again, the Court views Jerry Jung as an interested party, closely aligned with Plaintiffs. That said, it does bear consideration that he is not actually a Plaintiff in this case, while it is his conduct that is most directly impugned in these proceedings.

Plaintiffs' expert.

Each of the cases cited by Defendants in support of dismissal pursuant to Rule 37(d) involved repeated and flagrant violations of court orders, and circumstances generally far more egregious than those presented here. For example, Defendants rely most heavily on McMunn v. Memorial Sloan-Kettering Cancer Ctr., which they describe as "directly on point." (Def. Mem., at 23.) In that case, where the plaintiff altered audio recordings she had made of telephone conversations taped for use as evidence in her lawsuit, and which she had produced to the defendants under the assumption they were authentic, the court dismissed the action and imposed a $20,000 fine. McMunn, 191 F. Supp. 2d at 461-62. However, the McMunn court did not rely solely on the plaintiff's misconduct with regard to the audio recording. Rather, in addition to her tampering with the audio tapes, the court found that the plaintiff had "spoiled highly relevant evidence, . . . intentionally and in bad faith," with respect to her efforts to conceal the existence of a credit card; had "lied, was caught in her lies, and continues to lie," in her effort to prevent the deposition of her acquaintance; had engaged in "lying and scheming with respect to her apartment sale;" and had "intentionally and in bad faith repeatedly lied about where she was living." Plaintiffs' conduct here is not nearly as egregious. See Shangold v. Walt Disney Co., No. 03 Civ. 9522 (WHP), 2006 WL 71672, at *4 (S.D.N.Y. Jan. 12, 2006) ("Because dismissal sounds the death

knell of the lawsuit, district courts must reserve such strong
medicine for instances where the defaulting party's conduct is
correspondingly egregious." (internal citations omitted)).

Because lesser sanctions would sufficiently compensate
Defendants for the prejudice they have suffered as a result of
Plaintiffs' questionable conduct, Defendants' motion to dismiss
pursuant to Rule 37(d) should be denied.

      3.  <u>Lesser Sanctions</u>

The conduct of most concern to the Court, with regard to
Defendants' requests under both Rule 37(c) and (d), is Plaintiffs'
delay, evasiveness, and eventual dubious assertions in providing
Defendants with the tapes relied upon by Dr. Plum.  In fact, to
date, Plaintiffs still have not provided Defendants, or this Court,
with any explanation as to how they know that Tapes 6, 11 and 14
are the tapes upon which Dr. Plum relied.  Moreover, Plaintiffs
have not provided any explanation for why neither they, nor Jerry
Jung, produced the tapes and transcripts relied upon by Dr. Plum
for eight months after his expert affidavit was submitted in April,
or if and when they made attempts to obtain such information from
Dr. Plum.  Based on the evidence, discussed previously, that Tapes
6, 11 and 14 are likely not the tapes that Dr. Plum reviewed, and
Plaintiffs' complete failure to substantiate their claim to the
contrary, the Court infers no basis for Plaintiffs' assertions.
Put another way, Plaintiffs have been dilatory and misleading, and

should therefore be sanctioned.

Plaintiffs' sanctionable conduct can be seen as, in effect, resulting in the spoliation of evidence, i.e. "the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." Even without a discovery order, a district court may impose sanctions for spoliation, exercising its inherent power to control litigation. See Chambers v. NASCO, Inc., 501 U.S. 32, 43-45, 115 L. Ed. 2d 27, 111 S. Ct. 2123 (1991); Sassower v. Field, 973 F.2d 75, 80-81 (2d Cir. 1992). "[T]he sanction should be designed to deter future spoliation of evidence, shift the risk of an erroneous judgment onto the party responsible for the loss of evidence, and remedy the prejudice suffered by the other party." Basoum, 202 F.R.D. at 400 (citing West v. Goodyear Tire & Rubber Co., 167 F.3d 776, 779 (2d Cir. 1999)). Having initially failed to produce the tapes relied upon by Dr. Plum, and having presented no evidence that they ever attempted to obtain the tapes from Dr. Plum, and then finally making questionable representations to Defendants about which tapes were relied upon, Plaintiffs have ensured that Defendants will not be able to establish which tapes were actually reviewed by Dr. Plum in reaching his conclusions in the 2000 Affidavit. In turn, Defendants cannot obtain information as to the degree to which Dr. Plum relied upon his review of the tapes in forming his expert

opinion, and the Court and Defendants are further left with a significant and unanswerable question as to whether the tapes Dr. Plum relied upon were unedited. More generally, the simple fact is that Dr. Plum can no longer testify or provide information with regard to these, or any other, matters associated with his 2000 Opinion.

The Court must find an appropriate balance in compensating Defendants for the prejudice they have suffered, without effectively preventing Plaintiffs from pursuing this litigation on the basis of circumstances that are at least partly beyond their control. In the end, it is Plaintiffs who brought this action, and, whether justifiably or not, only informed Defendants of Dr. Plum's condition on the eve of his deposition. Plaintiffs also failed to meet their obligations under Rule 26(a) to timely provide all information relied upon by Dr. Plum in forming his opinion, and have not presented any evidence that they made such an effort, either prior to or after 2005, when any such information was lost.[7]

Taking these factors into consideration, as well as those relevant in determining whether to preclude evidence, the Court concludes that the appropriate remedy here is to preclude

---

[7] It is worth noting that Plaintiffs commenced the latest incarnation of this action in 2001. Surely, Plaintiffs could have anticipated using Dr. Plum as their expert at that time. Yet, Plaintiffs do not appear to have instructed Dr. Plum to preserve documents he relied upon in preparing his 2000 affidavit, and are hence partly responsible for Dr. Plum's failure to keep such records when he moved his offices in 2005.

Plaintiffs from both introducing Dr. Plum's 2000 and 2006 Affidavits as evidence directly AND as information to be considered by any substitute experts.[8]  In addition, if Plaintiffs choose to substitute new experts to replace Dr. Plum,[9] they should pay the expert costs and fees incurred by Defendants to date — both in preparing to depose Dr. Plum and in procuring rebuttal expert reports.

The exclusion of the 2000 and 2006 Opinions does not render Plaintiffs powerless to pursue this lawsuit.  The Court has not precluded Plaintiffs from presenting any of the tape recordings of Mrs. Gelman to new experts they may retain.  Plaintiffs, moreover, remain free to obtain expert opinions that take into consideration Dr. Plum's 1995 Examination Report and the affidavits relating to Mrs. Gelman's conduct prior to 1995, just as they were at the start of this litigation.[10]

In short, Defendants' motion for sanctions should be granted,

---

[8] It is unlikely these reports would have been directly admissible, as they are unassailably hearsay evidence.  And, as discussed in Part II, _infra_, it is unlikely that any new expert would be allowed to rely upon Dr. Plum's opinions — as opposed to his factual observations — in rendering their own opinion.

[9] _See_, Part II, _infra_, in which the Court holds that Plaintiffs should not be precluded at this point from employing new experts.

[10] Of course, any future determination as to whether new expert reports should be admitted in evidence would be heavily influenced by the issues of reliability, authenticity, and credibility raised here.

although, rather than dismissal, the following sanctions should be
imposed: Plaintiffs should be  1) precluded from offering into
evidence the 2000 and 2006 Opinions of Dr. Plum, 2) precluded from
allowing their experts to rely upon the 2000 and 2006 Opinions of
Dr. Plum, and 3) ordered, in the event Plaintiffs decide to procure
new experts, to pay all of Defendants' costs associated with
procuring their two expert reports refuting Dr. Plum's opinion, as
well as the fees incurred in preparing to depose Dr. Plum.[11]

II.   Plaintiffs Request to Substitute New Experts

        Plaintiffs seek to substitute two new experts to replace Dr.
Plum.  They have attached affidavits from two doctors stating that
they could each reach reliable conclusions with regard to Mrs.
Gelman's mental condition in 1992 based on Dr. Plum's 1995
Examination Report and 2000 and 2006 Affidavits, as well as various
affidavits recounting Mrs. Gelman's behavior prior to 1995.[12] (See
Segal Aff. ¶ 6; Blum Aff. ¶ 3.)  Plaintiffs argue that Drs. Segal
and Blum would meet all of the requirements of Rule 702 of the

---

[11] In the event Plaintiffs decide to proceed with new
experts, Defendants should directly submit to Plaintiffs a
breakdown of the costs and fees incurred in preparing to depose
Dr. Plum.  If disputes arise, the parties should attempt to
resolve them mutually, before seeking judicial assistance.

[12] Both doctors note that they reviewed Dr. Plum's 2000 and
2006 Opinions, and state that they would rely in part on those
documents in reaching their own conclusions.  However, based on
the Court's conclusion in Part I, supra, Drs. Segal and Blum
would not be allowed to consider Dr. Plum's 2000 and 2006
Opinions in reaching their conclusions.

Federal Rules of Evidence to qualify as experts in this case,[13] and that Defendants would not be prejudiced by their substitution. (<u>See</u> Pl. Opp. Mem., at 1-5.)  Defendants respond that Drs. Segal and Blum should not be substituted as new experts because they cannot reasonably rely upon Dr. Plum's prior opinions, as they are now hearsay evidence and additionally unreliable based on the events of this case. (<u>See</u> Def. Reply Mem., at 1-6.)

Defendants essentially argue that the expert opinions of Dr. Segal and Blum will inevitably be inadmissible, and thus allowing Plaintiffs to procure new experts would be futile.  Defendants may well be correct that the proposed experts should not be allowed to serve as mere conduits for admitting the hearsay evidence of a non-testifying expert, Dr. Plum. (<u>See</u> Def. Reply Mem., at 1.)  It may also be the case that, even if experts could rely on the hearsay opinions of prior experts, a court, acting in its gatekeeping

---

[13] Rule 702 of the Federal Rules of Evidence addresses the admissibility of testimony by experts.  Rule 703, which addresses issues regarding the information upon which an expert may rely in forming an opinion, states as follows:

> **Bases of Opinion Testimony by Experts.**
>
> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

Fed. R. Evid. 703.

capacity, would deem such expert testimony too unreliable to warrant admission under the circumstances presented here. See In re Rezulin Prods. Liab. Litig., 309 F. Supp. 2d 531, 561 (S.D.N.Y. 2004) ("[C]ourts must make an independent determination that the material in question is sufficiently reliable for experts in the field to rely upon it and are not bound merely to accept expert testimony based on questionable data simply because other experts use such data in the field." (internal quotations and citations omitted)).   However, an assessment of the admissibility of the proposed expert reports under Rule 702 is premature.  The Court is not presented with the expert reports of Drs. Segal and Blum, or the evidence upon which they intend to rely, because no reports yet exist.   The Court therefore will not preclude Plaintiffs from proceeding with new experts on the grounds that their reports will eventually be deemed inadmissible.

Based on the Court's ruling in Part I.B.3, infra, that Plaintiffs' substitute experts are precluded from relying upon Dr. Plum's 2000 and 2006 Opinions, it is worthwhile to briefly consider the issue of whether Dr. Plum's prior reports and opinions form a valid basis upon which substitute experts could reasonably rely. As an initial matter, there are numerous cases allowing experts to rely on findings by other experts. See, e.g., United States v. Tran Trong Cuong, 18 F.3d 1132, 1143 (4th Cir. 1994); In re Rezulin Prods., 309 F. Supp. 2d at 561; Bank Brussels Lambert v. Credit

Lyonnais (Suisse) S.A., Nos. 93 Civ. 6876 & 94 Civ. 2713 (LMM), 2000 WL 1694321, at *2 (S.D.N.Y. Nov. 13, 2000).  The operative term appears to be "findings."  That is, court's appear to distinguish between the rather prejudicial circumstance of experts relying upon, or reciting, the *opinions* of other experts not subject to cross-examination, and modern evidence law's apparent recognition that experts often rely on *facts and data* supplied by third-parties, including other experts. See, e.g., Bryan v. John Bean Div. of FMC Corp., 566 F.2d 541, 545 (5th Cir. 1978); Am. Home Assurance Co. v. Merck & Co., 462 F. Supp. 2d 435, 448 (S.D.N.Y. 2006).

Defendants cannot rely on the 2000 and 2006 Affidavits of Dr. Plum because those documents consist almost entirely of his opinions, formed largely on the basis of his review of his own observations in 1995.  To allow substitute experts to rely upon the 2000 and 2006 Opinions would prejudice Defendants by, in essence, once again subjecting them to the testimony of an expert witness they cannot cross-examine, while also bolstering the testimony of the substitute experts who will be able to claim that another experienced doctor agrees with them. See Tran Trong Cuong, 18 F.3d at 1143.  In addition, as has already been discussed at length, the basis upon which Dr. Plum reached his 2000 and 2006 conclusions is incurably in doubt, further supporting the argument that these opinions cannot be relied upon. See Am. Home Assurance Co., 462 F.

Supp. 2d at 448 (noting courts' concerns with "an expert relying on or incorporating the findings of another expert without familiarity regarding the basis for that expert's findings"). Finally, unlike the 1995 Examination Report, the 2000 and 2006 Opinions of Dr. Plum were specifically prepared for purposes of litigation. As such, they are not "by definition, of a type reasonably relied upon by experts in the particular field," as required under Rule 703 of the Federal Rules of Evidence. <u>Tran Trong Cuong</u>, 18 F.3d at 1143.

Returning to the request to substitute new experts, Plaintiffs, in effect, seek an enlargement of the discovery period in order to conduct expert discovery anew. Under Rule 16(b) of the Federal Rules of Civil Procedure, a scheduling order "shall not be modified except upon a showing of good cause . . . ." Fed. R. Civ. P. 16(b). "[A] finding of good cause depends on the diligence of the moving party." <u>Parker v. Columbia Pictures Indus.</u>, 204 F.3d 326, 339-40 (2d Cir. 2000); <u>see also</u> <u>White Diamond Co., Ltd. v. Castco, Inc.</u>, 436 F. Supp. 2d 615, 625 (S.D.N.Y. 2006); <u>Lincoln v. Potter</u>, 418 F. Supp. 2d 443, 454 (S.D.N.Y. 2006). As mentioned previously, this case presents a rather bizarre set of circumstances. While Plaintiffs conduct has not been exemplary, the inability to use Dr. Plum as an expert is not a situation created by Plaintiffs. While Defendants argue at length that any additional expert discovery would be futile, that is not a factor relevant in determining whether to grant a discovery extension.

Finally, inasmuch as Defendants argue that it would be prejudicial to allow Plaintiffs to essentially begin expert discovery all over again, the prejudice can be mitigated by requiring Plaintiffs to compensate Defendants for the costs and fees associated with their prior expert discovery efforts, as hereby ordered by the Court.

Thus, rather than dismissing the action, the Court recommends that Plaintiffs' request to present new experts to replace Dr. Plum be granted.

**CONCLUSION**

For the reasons set forth above, the Court respectfully recommends that Defendants' Motion to Dismiss be denied, and that Defendants' Motion for Sanctions be granted, in part, as outlined above.

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have ten days from service of this Report to file written objections. See also Fed. R. Civ. P. 6(a) and (e). Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable Richard M. Berman, United States District Judge, and to the chambers of the undersigned, Room 1660. Any requests for an extension of time for filing objections must be directed to Judge Berman. Failure to file objections will result in a waiver of those objections for purposes of appeal. See Thomas v. Arn, 474 U.S. 140, 149-52, 106 S. Ct. 466, 472-73 (1985); Mario v. P & C

40

Food Mkts., Inc., 313 F.3d 758, 766 (2d Cir. 2002); Spence v. Superintendent, 219 F.3d 162, 174 (2d Cir. 2000); Small v. Sec'y of Health and Human Servs., 892 F.2d 15, 16 (2d Cir. 1989) (per curiam).

Respectfully submitted,

THEODORE H. KATZ
UNITED STATES MAGISTRATE JUDGE

Dated:     August 10, 2007
           New York, New York


Copies mailed to:

John R. Horan, Esq.
Fox Horan & Camerini LLP
825 Third Avenue
New York, New York 10022

Jane Parver, Esq.
Kaye Scholer LLP
425 Park Avenue
New York, New York 10022