```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------X
ALICE ANN JUNG, et al.,          :
                                 :
                Plaintiffs,      :
                                 : 01 Civ. 6993 (RMB)(THK)
        -against-                :
                                 :      REPORT AND
JANET C. NESCHIS,                :      RECOMMENDATION
ROBERT P. LITTMAN, et al.,       :
                                 :
                                 :
                Defendants.      :
---------------------------------X
```

**FROM: THEODORE H. KATZ, UNITED STATES MAGISTRATE JUDGE.**
**TO: THE HON. RICHARD M. BERMAN, UNITED STATES DISTRICT JUDGE.**

Presently before the Court is Defendants' second Motion For Dismissal and Sanctions, pursuant to Federal Rule of Civil Procedure 37, arising out of what is alleged to be Plaintiffs' fraudulent and otherwise sanctionable conduct in the course of pretrial discovery. For the reasons that follow, the Court respectfully recommends that the Motion to Dismiss be denied, and that the Motion for Sanctions be granted.[1]

## BACKGROUND

### The Litigation

This action arises out of the probate of the estate of Mrs. Natasha Gelman ("Mrs. Gelman"). On July 30, 2001, Alice Ann Jung, the executrix of the estate of Miroslav Jung; Josef and Michelle Jung, her children; and Jaroslav Jung a/k/a Jerry Jung, her husband

---

[1] This action was referred to this Court, pursuant to 28 U.S.C. § 636(b)(1)(B) and (C), for general pretrial supervision and a Report and Recommendation on Defendants' pending motion.

COPIES MAILED
TO COUNSEL OF RECORD ON 3/6/09

(collectively, the "Jungs" or, not including Jerry Jung, "Plaintiffs"), relatives of Mrs. Gelman, filed the instant action against Defendants Janet Neschis ("Neschis"), Robert Littman ("Littman") and Marilyn G. Diamond ("Diamond") (collectively, "Defendants").   They allege that Defendants exercised undue influence over Mrs. Gelman and conspired to defraud her, after she "had become mentally incompetent in the last years of her life," in order to "obtain control over Mrs. Gelman's substantial assets and divert them to [Defendants'] personal use and benefit." (Amended Complaint, dated Oct. 30, 2002, at 1.)   The history of this dispute is discussed at length in the District Court's (Hon. Richard M. Berman) Opinion in <u>Weizmann v. Neschis</u>, 421 F. Supp. 2d 654 (S.D.N.Y. 2005), and is thus not recapitulated in detail here.[2]

Briefly, Plaintiffs argue that changes made in 1992 to the beneficiary provisions of the by-laws of Anturia, a Liechtenstein "stiftung" or foundation to which the Gelmans had contributed a substantial portion of their assets, requested by Mrs. Gelman six years before she died in 1998, are invalid because they were made as a result of undue influence by Defendants at a time when Mrs. Gelman had Alzheimer's disease, and thus lacked testamentary capacity.   These allegations were also made in 1999, when the Jungs filed Amended Objections to Probate in New York's Surrogate Court

---

[2] The Weizmann Institute, another of the initial beneficiaries of the Gelman estate, was the plaintiff in a companion case to this one.   That case was eventually settled.

2

— which they later withdrew — asserting that Mrs. Gelman's 1993 New York Will was invalid because she lacked testamentary capacity and because the Will was produced as a result of undue influence by Defendants Neschis and Littman.   The allegations were again raised in 2000, when the Jungs intervened in an arbitration in Liechtenstein involving the issue of whether Mrs. Gelman lacked testamentary capacity to amend the Anturia by-laws in 1992.   In a 53-page award, dated June 8, 2001, the arbitrators held that the 1992 by-laws were legally valid because, "at the time [Mrs. Gelman] signed her instructions" directing their adoption, she "possessed testamentary capacity," and was not "unduly influenced by a third-party."   See id. at 661 (quoting arbitration award).   Subsequently, the Surrogate's Court submitted the 1993 New York Will to probate.

On July 30, 2001, the Jungs commenced this action, and on October 3, 2002, Judge Berman granted in part and denied in part Defendants' motion to dismiss on the basis of collateral estoppel. The Jungs then filed their Amended Complaint on October 30, 2002, and, on December 14, 2005, the Court granted in part and denied in part Defendants' renewed motion for summary judgment on the issue of the collateral estoppel effect of the Liechtenstein arbitration. See Weizmann, 421 F. Supp. 2d at 677, 680.   The Court held that, in the arbitration, "[the Jungs] were afforded 'a full and fair opportunity to adjudicate' the issue of Mrs. Gelman's testamentary capacity," id. at 680, and that the arbitration panel's finding

3

that Mrs. Gelman had testamentary capacity was "well reasoned and a careful marshaling and analysis of the evidence." Id. at 681. The Court also found that "the issue of Mrs. Gelman's testamentary capacity was necessarily decided by the Arbitration Award," and, thus, "interests in finality demand that they not be given a second chance to raise the same issue here." Id. at 677.

However, the Court also held that Plaintiffs were not collaterally estopped from contending that the 1992 by-law changes were the result of undue influence. The Court reasoned that "[a]lthough the Tribunal stated that Mrs. Gelman was not 'unduly influenced by a third party,' the Tribunal did not marshal supporting evidence (or law) for its finding." The Court further noted that "[u]nder New York law . . . a finding of testamentary capacity does not necessarily preclude a finding of fraud or undue influence in the making of a will." Id. at 678 (citing In re Estate of Johnson, 6 A.D.3d 859, 861, 775 N.Y.S.2d 107, 109 (3d Dep't 2004))(internal citations omitted).

Alleged Discovery Misconduct

There has been extensive and contentious pretrial discovery in this action, focused on the issue of whether Mrs. Gelman was subject to undue influence when she executed the 1992 by-law changes. Until relatively recently, Plaintiffs' claim that Mrs. Gelman suffered from Alzheimer's disease, by as early as 1992, was heavily dependent upon the expert opinion of a neurologist, Dr.

4

Fred Plum. However, Dr. Plum himself was diagnosed with Alzheimer's disease, and, in addition, substantial controversy arose about the reliability of Dr. Plum's conclusions about Mrs. Gelman's mental capacity, and the materials on which he based his opinions. That controversy was the subject of Defendants' first motion to dismiss and for sanctions. The Court concluded that Plaintiffs unduly delayed in submitting information about, and relied upon by, Dr. Plum, and that the information that was provided was incomplete and misleading. As a consequence, the Court determined that Plaintiffs should be precluded from introducing in evidence Dr. Plum's affidavits, and the affidavits could not be relied upon by Plaintiffs' two newly-retained experts in reaching their opinions about Mrs. Gelman's mental capacity. The Court further determined that Plaintiffs were required to compensate Defendants for the time and expense they incurred in addressing and rebutting Dr. Plum's opinions.[3] Because these sanctions were viewed as sufficient to address Plaintiffs' misconduct, the Court did not recommend that the sanction of dismissal, requested by Defendants, be imposed. See Jung v. Neschis, No. 01 Civ. 6993 (RMB)(THK), 2007 WL 5256966 (S.D.N.Y. Oct. 23, 2007). The District Court adopted this Court's

---

[3] In a subsequent Order, the Court determined that the sanction Plaintiffs owed to Defendants Neschis and Diamond amounts to $214,654.01, and the sanction payable to Defendant Littman is $2,272.50. (See Memorandum Opinion and Order, dated June 12, 2008.)

recommendations in their entirety. (<u>See</u> Order, dated Sept. 21, 2007.)

Defendants now argue that they "have irrefutable proof" that Plaintiffs have engaged in further "fraudulent conduct" by submitting fabricated evidence to their new experts, "thereby committing further fraud on the Court." (Memorandum of Law in Support of Defendants' Motion to Dismiss Pursuant to Fed. R. Civ. P. 37 ("Defs.' Mem."), at 1.) According to Defendants, Plaintiffs have furnished their new experts with a CT head scan of Mrs. Gelman, purportedly taken on Sunday, August 15, 1993, and a fabricated CT scan report, intended to bolster Plaintiffs' claim that Mrs. Gelman had Alzheimer's disease and was mentally incapacitated at the time that she amended the Anturia by-laws. Defendants contend that this latest misconduct, combined with what they argue is evidence that Plaintiffs have altered various audiotapes that were produced in discovery, in addition to Plaintiffs' history of sanctionable conduct, now merits dismissal of this action and other sanctions.

The parties provided extensive written submissions to the Court on these matters and, in addition, the Court held an evidentiary hearing on January 14 and February 19, 2009.

6

## DISCUSSION

### I. The Parties' Contentions

#### A. The CT scan

After the Court sanctioned Plaintiffs with respect to various disclosures and non-disclosures about their previous expert, Dr. Plum, they sought to have the Court reconsider or delay imposition of the monetary sanction, and opposed the Court's staying the action until they paid the monetary sanction, by asserting, inter alia, that their "new experts are offering their opinion based upon familiar factual material," and that, based upon the new expert reports, Defendants' experts and counsel "have exactly the same factual ground to cover that has been revealed for the last eight years of this litigation since its inception in Surrogate's Court, through its Lichtenstein [sic] arbitration and finally in this court." (Letter from John R. Horan, Esq., to the Court, dated Dec. 14, 2007, Exhibit ("Ex.") 4 to Affidavit of Jane W. Parver, Esq., dated Aug. 8, 2008 ("Parver Aff.").)  Similarly, in opposing the amount of attorneys' fees Defendants were seeking as a sanction, Plaintiffs took the position that Defendants' lawyers and experts "will now have little preparation to do for the next examination of plaintiffs' new expert witnesses; there is absolutely no new material to review." (Affirmation of John R. Horan, Esq., dated Jan. 22, 2008 ("Horan Jan. 22 Aff."), ¶ 3.)

However, Plaintiffs did, in fact, provide their new experts

7

with a report of a purported August 15, 1993 CT head scan of Mrs.
Gelman, allegedly performed in Mexico (see Parver Aff. Ex. 3), which
suggests that she had Alzheimer's disease at that time.  Plaintiffs'
new experts reviewed and relied upon the CT scan report to support
their conclusion that Mrs. Gelman suffered from Alzheimer's disease
in 1993 and earlier.  Upon receiving Plaintiffs' revised expert
reports, and noting their referral to the 1993 CT scan and report,
Defendants' counsel requested copies of the documents.  Defendants
faulted Plaintiffs not only for relying on "new material"
notwithstanding assurances that they would not do so, but for not
producing the report to Defendants when it was discovered, as they
were required to do to fulfill their discovery obligations.[4]

Defendants subsequently submitted compelling evidence showing
that the 1993 CT scan report was fabricated.  Gustavo Gonzalez Baez,
a Mexican attorney and investigator retained by Defendants,
undertook an investigation.  He concluded that the 1993 report,
which was purportedly prepared by a Dr. Valentin Reyes Hernandez,
based on a scan purportedly taken at the Laboratorios Alvernia ("the

---

[4] Plaintiffs' counsel represented that he "promptly turned .
. . over" the CT scan and report to Defendants' counsel and
Plaintiffs' experts upon receiving it in "early October 2007."
(See Affidavit of John R. Horan in Opposition to Motion to
Dismiss, dated Sept. 15, 2008 ("Horan Aff."), ¶ 4.)  However,
correspondence shows that he did not provide the documents until
December 5, and only after Defendants requested them as a result
of reviewing Plaintiffs' experts' reports.  (See Letter from
Andrew K. Solow, esq., dated Nov. 26, 2007, Defs.' Ex. A-17;
Letter from John A. Horan, esq., dated Dec. 5, 2007, Defs.' Ex.
A-18.)

8

lab"), is a complete fabrication. (See Declaration of Gustavo Gonzalez Baez, dated July 31, 2008 ("Baez Decl."); Testimony of Gustavo Gonzalez Baez, Transcript of January 14, 2008 Hearing ("H. Tr."), at 14-48.)   Among Mr. Baez's findings were:

(1) Although the report purports to have been written on the letterhead of Laboratorios Alvernia in 1993, the incorporation documents for the lab, which were publicly filed, indicate that it was not incorporated, and did not exist, until 1999.   (See Baez Decl. ¶ 6 & Ex. F; H. Tr. at 29.)

(2) Mr. Baez visited the lab, which is a clinic for low income people, and he was informed by the assistant manager that the lab was not created until 1999. (See Baez Decl. ¶ 5.)

(3) There are two eight-digit telephone numbers for the lab on the letterhead of the lab report.   However, Mexico did not change from seven-digit telephone numbers to eight-digit numbers until 1999. (See id. ¶ 7 & Ex. G; H. Tr. at 27.)

(4) Mr. Baez located and interviewed Dr. Valentin Reyes Hernandez, whose name appears on the lab report, after confirming that there was only one licensed radiologist with that name in Mexico in 1993.   Dr. Hernandez informed Mr. Baez that he never performed CT scans, he had not performed the procedure which is the subject of the report, the signature on the report is not his signature, and he never met Mrs. Gelman or the doctor to whom the report is addressed.   Mr. Baez includes in his report an affidavit

9

from Dr. Hernandez swearing to these facts.  (See Baez Decl. ¶ 8 & Ex. H; H. Tr. at 35-42.)[5]

Plaintiffs maintained that they were not the source of the 1993 CT scan report.  According to Jerry Jung ("Jung" or "Mr. Jung"), Plaintiff Alice Jung's husband,[6] he received a call in mid-August 2007 from Mario Sebastian ("Sebastian" or "Mr. Sebastian"), a Mexican citizen who is a half-brother of Mrs. Gelman.  (See Affidavit of Jerry Jung, dated Sept. 13, 2008 ("Jung Aff."), ¶ 2.) Mr. Sebastian indicated that he had "an 'x-ray' of [Mrs. Gelman], some family pictures, and some other documents that he thought I

_____

[5] The sworn, certified affidavit of Dr. Hernandez is technically hearsay. Nevertheless, in addressing Defendants' written submissions on the motion, Plaintiffs did not object to its consideration by the Court.  While they did lodge such an objection at the hearing, they also acknowledged that there need not have been a hearing and that the primary purpose of the hearing was to allow Mr. Jung an opportunity to be heard. (See H. Tr. at 37-41.)  There is thus some basis to conclude that Plaintiffs waived their objection to the Court's consideration of the document.  Nevertheless, the Court need not rely on the document to conclude that the CT scan and report were fabricated — a conclusion Plaintiffs concede they are unable to dispute. Moreover, the document has been admitted in evidence, not for the truth of the matters asserted therein, but as evidence that Defendants were able to track down Dr. Hernandez, and that Plaintiffs could have tracked down Dr. Hernandez as well, had they chosen to, to confirm whether or not he actually authored the CT scan report.

[6] Mr. Jung was dismissed as a Plaintiff in this action.  It is undisputed, however, that he continues to play a critical role in the litigation. (See Jung Aff. ¶ 1 - "I am the principal source of all funds necessary to pursue this action on [Plaintiffs'] behalf, as well as the principal actor on their behalf in respect of all actions taken during the course of this litigation.".)

might find useful." (Id.)    Sebastian "apparently" found the
documents among some "papers or files of . . . [Mrs.] Gelman."
(Horan Aff. ¶ 4.)    Mr. Jung directed Sebastian to deliver the
documents and x-ray to his attorney in Mexico.[7]   Thereafter, in
September 2007, Jung received the documents from his Mexican
counsel.   According to Jung, he had no prior knowledge of the CT
scan and made no independent inquiry about it, "[a]s it appeared to
be what it was." (Id.)

     Although confronted with obvious evidence that the report was
falsified, Plaintiffs initially objected to the "serious and
scurrilous nature" of Defendants' accusations, and attempted to
refute them.    (Letter from John Horan, Esq., dated Aug. 28, 2008
("Horan Aug. 8 Ltr.").)   Plaintiffs reported that, once they were
alerted to the accusation that the report was fabricated, they had
Mr. Jung's Mexican attorneys look into the matter, although the
Court has yet to receive any information discovered in this
investigation.   Plaintiffs did, however, provide a statement from
Mario Moreno Ivanova ("Moreno" or "Mr. Moreno"), a purported godson
of Mrs. Gelman, reflecting what he knows about the "possible
origins" of the CT scan report.   (Horan Aff. ¶ 5.)   In early August
of 1993, Moreno claims to have made an appointment for a CAT scan
for Mrs. Gelman, with Dr. Guillermo Chavez.   He further claims that
on or about August 15, 1993, he took Mrs. Gelman to the clinic for

_____

     [7] Mr. Sebastian is now deceased. (See Jung Aff. ¶ 2.)

11

the CAT scan. (See Horan Aff. Ex. C.)

Plaintiffs argue that they had no reason to suspect the bona fides of the 1993 CT scan report and, even if the report turns out to be false, Plaintiffs are not responsible for its creation. Thus, it is Plaintiffs' position that if the Court determines that the report was fabricated, the appropriate remedy is to exclude the report and have Plaintiffs' experts amend their reports, if such amendment is necessary. Plaintiffs contend that they have not attempted to defraud the Court or anyone else.

Defendants respond that Plaintiffs' contentions are not plausible. Plaintiffs do not dispute that, in connection with the Liechtenstein arbitration over Mrs. Gelman's amendments to the Anturia Trust, and her capacity to effect those amendments, Plaintiffs' lawyers employed investigators who reviewed medical records in Mexico, and they interviewed Mrs. Gelman's primary care physician in Mexico. Yet, in the nearly ten years of litigation over Mrs. Gelman's mental capacity, in this and other fora, neither Plaintiffs nor any other parties have ever seen or referred to a CT scan or report from 1993, or come across the name of the physician who allegedly requested the procedure. Thus, Defendants question why, when suddenly confronted with the only pieces of clinical evidence purporting to show that Mrs. Gelman had Alzheimer's disease to ever emerge in this protracted dispute, Plaintiffs just assumed that they were authentic, and conducted no investigation.

12

Plaintiffs did not make any effort to question Sebastian — who died in January of 2008 — while he was alive, about how he learned of these documents or where he found them. (See Reply Affidavit of Jane W. Parver, Esq., dated Sept. 26, 2008 ("Parver Reply Aff."), ¶ 14.) Nor did they seek out and question the purported author of the report, Dr. Valentin Reyes Hernandez, or the doctor who ordered the CT scan. At a minimum, Defendants argue, if Plaintiffs truly believed the documents were authentic, they had every incentive to strengthen their claims by procuring testimony from Dr. Hernandez, and any additional medical records he might have that could corroborate his purported conclusion as stated on the report.

Defendants contend that Plaintiffs should have been alerted to the implausibility of Sebastian's having recently discovered the CT scan report. When he testified in August 1999 in the New York Surrogate's Court proceeding, to which Jung was also a party, Sebastian stated that he last saw Mrs. Gelman in 1985, last spoke with her in 1986, and had not even been aware of her death until someone brought it to his attention. (See Sebastian Deposition Transcript, Parver Reply Aff., Ex. 2, at 45-46.) He had no access to her papers and no plausible basis to be in possession of her medical records. Of course, now that he is no longer alive, it is impossible to ascertain precisely how he came into possession of the CT scan report.

Defendants argue that Plaintiffs' submission of the statement

of Mr. Moreno, where he claims that he escorted Mrs. Gelman to an appointment for a CT scan in 1993, compounds their misconduct. Defendants provide another affidavit executed by Moreno in 2000, which he submitted in support of Jung's challenge to the probate of Mrs. Gelman's New York Will. (See Parver Reply Aff. Ex. 5.)   In the 2000 affidavit, Moreno stated that when he spoke to Mrs. Gelman in April 1993, "she did not know him."   He tried to telephone her several times after that but could not have a conversation with her. And, in early 1994, he drove to Cuernavaca to visit with her, but she remembered nothing and still could not converse with him lucidly. (Id. ¶¶ 9-10.)   This earlier affidavit, Defendants contend, demonstrates that Moreno is now lying, because it conspicuously omits any mention of even seeing Mrs. Gelman in 1993, much less visiting a doctor with her.   (See id.)

Furthermore, it appears that Moreno submitted his statement about the 1993 doctor's visit with Mrs. Gelman after speaking with Jung, although Jung provides no information about how he procured the statement.[8]   Plaintiffs' counsel testified at the hearing that Jung said he was in contact with Moreno, but that Jung did not explain why it occurred to him to ask Moreno what he might know about the CT scan report.   (See H. Tr. at 341.) Defendants

---

[8] Defendants also point out that Jung's claim against the Estate of Natasha Gelman in the Mexican courts was brought in the name of Moreno's wife, who presented herself as Jung's attorney-in-fact. (See Garcia Luque Decl., Parver Reply Aff. Ex. 3, at 2.)

14

insinuate that Jung procured the statement from Moreno, knowing it to be false, in an attempt to rehabilitate the discredited CT scan report. Thus, Defendants argue that, in the face of damning evidence that the report was fabricated, Plaintiffs resorted to submitting additional false evidence to defend its authenticity. At the very least, Defendants submit, Plaintiffs should have been suspicious of any story Moreno told, given that he has a history of proffering unreliable evidence and testimony in other Court proceedings. <u>See</u> <u>infra</u> Section IV.

In light of all of these circumstances, Defendants conclude that "there were numerous facts and circumstances that should have caused plaintiffs and their counsel to make further inquiries before providing the alleged August 15, 1993 CT scan lab report to Plaintiffs' experts," and before submitting their opposition to Defendants' motion for sanctions. (Parver Reply Aff. ¶ 25.)

### 2. <u>Plaintiffs' Reliance on Tapes of Purported Conversations with Mrs. Gelman</u>

Defendants cite other discovery-related conduct of Plaintiffs as additional grounds for sanctions.

Jerry Jung claims to have recorded many of his conversations with Mrs. Gelman. In their first motion for sanctions, Defendants argued that Jung produced altered tapes of those conversations. Some of those tapes were produced to Dr. Plum, Plaintiffs' original expert, but the Court precluded Plaintiffs from offering Dr. Plum's report and opinions in evidence, because it was not clear precisely

15

what materials he relied upon, and Dr. Plum was no longer capable of clarifying the matter. Nevertheless, Defendants raised numerous questions about the reliability of Plaintiffs' representations about the tapes.

In opposing Defendants' first motion for sanctions, Mr. Jung submitted an affidavit in which he swore that his conversations with Mrs. Gelman were recorded on micro-cassette tapes, including the conversations on Tapes 4 and 5. (See Affidavit of Jaroslav Jung, dated Mar. 22, 2007 ("Jung 2007 Aff.") ¶¶ 4, 14, Parver Aff. Ex. 15.) When Plaintiffs produced the tapes, however, which they claimed to be originals, they produced a standard size cassette and represented that the original of Tapes 4 and 5 were on that cassette. Mr. Jung also swore that after each conversation was recorded, he placed the micro-cassette in an envelope, wrote down the date of the conversations on the envelope, and placed the envelope in a safe. (See id. ¶ 5.) In the same affidavit, however, he stated, somewhat inconsistently, that he left the micro-cassette on which he recorded Tape 4 in the tape recorder for almost a month, until he recorded Tape 5. (See id. ¶ 14.) His explanation is that when a conversation was brief, he may have taped more than one conversation on the same cassette. (See id. ¶ 4.) Plaintiffs never produced the envelopes which allegedly contained the dates on which the conversations were recorded, although they were supposed to have been stored in a safe.

16

Moreover, Mr. Jung has provided different or corrected dates for a number of tapes, despite the fact that he stated in his affidavit that upon completion of a conversation, the dates were written on the envelopes and they were then stored in a safe. (See Parver Aff. ¶¶ 5, 24(c).)

Because of the murky circumstances surrounding the creation and use of the taped conversations, the Court directed in its earlier sanction Order, that "by November 7, 2007, Plaintiffs [were to] notify Defendants whether they intend to rely, in any capacity, on tape recorded conversations with Mrs. Natasha Gelman, and, if so, shall identify the tapes." On November 7, 2007, Plaintiffs indicated that they "intend to rely upon the taped conversations with Natasha Gelman already furnished to [defendants] in transcript form, numbered 5, 6, 9, 11, 12, 13, and 14, only to the extent that they have been provided to Dr. Segal and Dr. Blum [Plaintiffs' experts] as background information.  We do not know if either expert will use them or any one of them to form their respective opinions." (Letter from John Horan, Esq., dated Nov. 17, 2007, Parver Aff. Ex. 17.)  In fact, in his November 16, 2007 report, Dr. Segal states that he considered four tapes of conversations between Jung and Mrs. Gelman, that took place between 1992 and 1995. (See Parver Aff. Ex. 6, at 1.)  But, according to Plaintiffs, Tape 4 was the only tape recorded in 1992, and Tape 4 was not one of the tapes identified in Plaintiffs' November 7 letter as one they would rely

17

upon.  It appears, however, that Dr. Segal corrected his report, as a letter from Plaintiffs' counsel to Defendants' counsel states that the four tapes relied upon by Dr. Segal were recorded in 1993 and 1994, not in 1992.  (See Parver Aff. Ex. 7.)   This therefore appears to leave only the authenticity of Tapes 5 and 9 in issue,[9] which Plaintiffs' other expert, Dr. Blum, also relied upon.

In a December 11, 2006 report prepared by Thomas J. Owen, a forensic audio expert employed by Defendants, Mr. Owen concluded that at least Tapes 4, 5, and 9 were not originals, and had been tampered with and re-recorded.  At that time, the Court saw no reason to address the issue since the use of Dr. Plum's expert report had been precluded and the tapes were most relevant to his report.  Although Plaintiffs claimed that if Defendants challenged any tapes, they would submit expert evidence in support of the tapes' authenticity, more than a year later Plaintiffs produced an expert report by James B. Reames, in which Mr. Reames contends that he did an analysis only of Tape 9, which led him to conclude that it is authentic.  Mr. Reames offered no opinions on Tapes 4 and 5, although Plaintiffs' new psychiatric and neurological experts appear to have relied upon one or both of those tapes in formulating their opinions about Mrs. Gelman's mental capacity.

---

[9] In a letter dated November 13, 2007, Plaintiffs represented that there "are other tapes such as the one of Mr. Littman and Mr. Jung, which we intend to use in evidence which no doubt will be the subject of further controversy." (Parver Aff. Ex. 18.)

Plaintiffs' explanation for Mr. Reames's limited review of the tapes was the expense involved. According to Mr. Jung, he spent over $36,000 to produce the report on Tape 9, and has not yet decided to spend additional money in analyzing two more tapes. (See Jung Aff. ¶ 4.) Jung continues to proclaim that the tapes are authentic, and, in any event, Plaintiffs argue that the authenticity of the tapes is an issue for the trier of fact to decide and should not be the subject of a separate, costly, time-consuming proceeding. (See Horan Aff. ¶ 9.) They contend that Mr. Jung will testify at trial to the authenticity of the tapes, he can be cross-examined and, if they decide to, Plaintiffs will have an expert who addresses the subject at trial.

Defendants responded that Plaintiffs were required to offer a rebuttal expert report to that of their audio expert, and, to the extent that they did not rebut Dr. Owen's views with respect to Tapes 4 and 5, they should be precluded from offering any expert testimony on those tapes at trial. Defendants also complained that Plaintiffs refused to produce materials created by their expert when analyzing Tape 9, in violation of their obligations under Fed. R. Civ. P. 26(a)(1)(B)(2).

In sum, citing (1) Plaintiffs' submission of the alleged fabricated CT scan report and reliance on the report by Plaintiffs' experts, (2) Plaintiffs' submission of altered tapes and reliance on the tapes by Plaintiffs' experts, (3) the inconsistent sworn

19

statements about how the tapes were made and preserved, (4) the failure to offer expert rebuttal testimony about the authenticity of Tapes 4 and 5, (5) the failure to produce the material relied upon by the audio expert, combined with Plaintiffs' other sanctionable conduct relating to the report and testimony of the original neurological expert, Dr. Plum, Defendants seek dismissal of the action or other meaningful sanctions, including (1) preclusion of any expert medical testimony by Drs. Segal and Blum, (2) preclusion of use of the tape recordings or any expert testimony regarding the tape recordings, (3) preclusion of Dr. Plum's March 20, 1995 report on his examination of Mrs. Gelman, or any testimony about that report, and (4) the payment of Defendants' attorneys' fees and costs for defending the entire case, as well as the fees and costs incurred in bringing the instant motion.

## II.  The Evidentiary Hearing

Based upon the written submissions, the Court advised the parties that it had concluded that the 1993 CT scan and report were fabricated — a conclusion that Plaintiffs conceded they were not able to dispute, given that they never received any results from the requested investigation of the CT scan and report by Mr. Jung's Mexican counsel.   In fact, Plaintiffs agreed that they would not rely upon the CT scan in any fashion.   This concession did not resolve, however, the question of whether Plaintiffs, through Mr. Jung, submitted the scan and report knowing, either actually or

20

constructively, that it was fabricated. Moreover, there remained the issue of the audiotapes — whether they are authentic and, if not, whether the Jungs have also been aware of that fact. The Court therefore scheduled an evidentiary hearing on the matter.

Notwithstanding the fact that the parties were given close to two months' notice of the hearing date, on the day prior to the hearing the Court was informed that Mr. and Mrs. Jung, who reside in California, would not be able to attend because Mr. Jung had a serious health issue relating to his heart.[10]  Nevertheless, the hearing proceeded on January 13, because other witnesses, including experts, were prepared to testify. At the hearing, the Court heard testimony from Thomas Owen, Defendants' expert forensic audiologist, and James B. Reames, Plaintiffs' expert in this field. Mr. Gonzalez-Baez, the Mexican attorney Defendants hired to investigate the CT scan and report, and Steven J. Hyman, an attorney who was involved in prior litigation over Mrs. Gelman's assets, also testified.

### A.   Defendants' Expert

Thomas Owen has been a forensic tape analyst since 1979, and, since 1992, he has operated a school for the study of audio and video tape analysis that is staffed with teachers who have been employed by the FBI, the federal Drug Enforcement Administration

---

[10] A letter submitted by Mr. Jung's physician made no reference to a heart condition, citing instead a spike in Mr. Jung's blood pressure and extreme dizziness.

21

("DEA"), and other federal agencies. (See H. Tr. at 63-64.)[11]  Mr. Owen is a member of the Audio Engineering Society, has chaired its Forensic Audio Standards Work Group since 1992, and has published thirteen or fourteen peer-reviewed articles in the Audio Engineering Society Journal. (See id. at 66-67, 69.)  While he was chair of the Forensic Audio Standards Work Group, it issued standards for the examination of analog audiotapes. (See id. at 69.)[12]

Mr. Owen explained that it is not possible for a forensic tape analyst to opine that an audio recording is a fair and accurate copy of the original, unless he also has the original tape. (Id. at 75-76.)  This principle is embodied in professional standards for verifying the authenticity of tapes, in the well-accepted literature, and in FBI standards. (Id. at 77-79.)

Mr. Owen described the 12-step methodology he has created and published for the authenticity examination of audiotapes.  After converting a tape to digital form and downloading it to a computer, the necessary steps include: (1) critical listening for anomalies; (2) waveform analysis that allows examination of the amplitude (volume) of the sound on the tape over a period of time; (3)

---

[11] Mr. Owen also teaches at his school, and has served as a guest lecturer at John Jay College of Criminal Justice. (See id.)

[12] Mr. Owen was employed by, and has consulted for, the United States Department of Justice, and has testified as an expert in numerous federal and state cases. (See id. at 70-71.)

spectrum analysis (FFT) that produces frequency-versus-amplitude and frequency-versus-amplitude-versus-time displays of chosen frequency ranges that occur on the tape; (4) spectographic analysis, which measures time, energy (strength) and frequency of sound; and (5) magnetic development, which involves placing a fluid on the tape and developing under a microscope a picture of all of the stops, starts, over-recordings, and pauses that are imprinted on the tape. (See id. at 79-94.)

Mr. Owen conducted an authenticity examination of Tapes 4, 5, and 9 — tapes that Jerry Jung has represented to the Court and to his experts are original tapes of his conversations with Natasha Gelman.  Mr. Owen concluded with a reasonable degree of certainty that none of the three tapes are originals.  (See id. at 95-96.) As for the cassette which has been identified as Tapes 4 and 5, which is essentially one tape containing two separate conversations that allegedly occurred on December 19, 2002 and January 19, 1993 (see id. at 124), Mr. Owen found that the tape was continuous.  If the tape was an original, and it contained two separated conversations, there would be a break between the conversations. Thus, in Mr. Owen's view, "it wasn't a close call at all.  It was a sort of slam dunk for a copy." (Id. at 100.)

In analyzing Tape 9, Mr. Owen found that there were two start signatures on the tape, with the second one over-recording previously recorded material. (Id. at 102, 106.)  The material that

23

had been over-recorded was recorded on a different tape machine than the material that was subsequently recorded. (Id. at 107-08.) More significantly, at approximately twenty-five minutes into the tape, the amplitude of the background hum almost doubles, which is both audible and visible on the spectrum analyzer. (See id. at 102.) Mr. Owen also heard a "click," at that point in the tape, at which point there is a clipped word. In viewing a magnetic image of the tape at the same point, Owen found a "pause mark." (Id. at 111.) These indicia led Owen to conclude that something out of the ordinary occurred at that point on the tape, that was inconsistent with the tape being an original. (See id. at 113.)

Owen then conducted a spectrum and spectographic analysis of the tape. One thing that drew his attention was the aforementioned background hum, which he referred to as a "60-cycle hum." (See id. at 87.) The 60-cycle hum is a sound component present on almost all audio recordings made in the United States. This component results from the standard 60 hertz AC electrical power on which audio recorders run, and thus registers at a frequency of approximately 60 hertz.[13] (See id. at 87.) On Tape 9, Owen noted a significant increase in the amplitude and precise frequency of

---

[13] Harmonics are integer multiples of the 60-cycle hum, which can also be viewed and analyzed. (See Reames March 29, 2007 Report, Defendants' Ex. E-4, at 3-4.) Statistically significant differences in the precise frequency of a 60-cycle hum, and its harmonics, are evidence that a recording was made from different locations or at different times.

the signature from the 60-cycle hum after the point in the tape that contained the audible and visible anomaly. (See id. at 113-14, 120-21.)  He measured a difference of approximately .2 hertz between the frequency of the hum before the anomaly, and its frequency after the anomaly. Based on this .2 hertz differential, Owen concluded that Tape 9 contains two different sections of a recording, or several recordings.[14]  According to Owen, the last five minutes of the tape were "from either the same recording at a different place or a different recording." (Id. at 120.)  "It could be two conversations put together, it could be the same conversation with certain parts excised." (Id. at 140.)  Thus, according to Owen, the tape is not the original recording of one continuous conversation.

B.   Plaintiffs' Expert

James B. Reames is an expert in forensic tape analysis. He is the President of JBR Technology, a company that specializes in the forensic analysis of tapes. (See H. Tr. 143-44.)  Mr. Reames worked for the FBI for over thirty years, and helped set up the FBI's audio enhancement authenticity laboratory. He was ultimately

---

[14] A well-respected article on forensic audio authentication, which both parties' experts cited and acknowledged to be authoritative, notes that the stability and accuracy of power line frequency was found in one experiment to rarely vary more than .060 hertz, plus or minus .01%, for time periods of fifteen seconds or longer. (See Defendants' Ex. E-20, "Authentication of Forensic Audio Recordings", Bruce E. Koenig, Journal of the Audio Engineering Society, Vol.38, No. 1/2, 1990 January/February, at 24.)

in charge of that unit, and became the director of all electronic research for the FBI. (See id. at 146.)  Nevertheless, in the forty years of his career he only conducted approximately thirty examinations of analog audiotapes, such as the ones is issue in this action.  (See id. at 174.)[15]

Mr. Reames agreed with Mr. Owen's view that a tape is authentic if it was "made simultaneously when the conversations occurred.  So it would be the original recording, if it's authentic, and it would be made the way people said they made it." (Id. at 148.)  Mr. Reames also agreed that if a copied tape is being analyzed, it is impossible to make any definitive statement about its authenticity. (See id. at 198-99.)

Although Mr. Jung sent Mr. Reames Tapes 4,5 and 9, initially he asked Reames to analyze only the authenticity of Tape 9. (See id. at 153.)  Mr. Reames ran tests on the tape that were similar to those run by Mr. Owen. (See id. at 154.)[16]  However, instead of making a magnetic image of only the portions where there appeared to be an anomaly, he made a magnetic image of the entire tape. (See id. at 158.)  And, he utilized a different method for imaging the

---

[15] Mr. Reames could not conclusively say whether he has ever had an article published in a peer-reviewed journal.  He thought that he might have co-authored an article that was peer-reviewed. (See id. at 177.)

[16] Reames engaged in "critical listening," to detect any anomalies in the tape.  He conceded on cross-examination, however, that he suffers from hearing loss. (See id. at 173-74.)

tape: he shined a polarized light on a garnet crystal that touched the tape.  In his view, this provided greater resolution than by placing a ferrofluid on the tape.  (See id. at 159.)[17]   Reames conceded, however, that the magnetic image that was made by Mr. Owens clearly showed the same events on tape that Reames found.  (See id. at 193.)  Moreover, although he developed 9,051 images of Tape 9, he was unable to identify the image of the spot where Mr. Owen believed a break had occurred, and where he detected a pause signature in the tape.  (See id. at 210-11.)

Mr. Reames concluded that Tape 9 was original.  Although he did find that, at a certain point in the tape, he heard a click and a clipped word, as Mr. Owen did, and agreed that the background "hum level changed" (id. at 165:19-22), Reames was of the view that this anomaly resulted from the telephone company taking the long-distance line on which Jung and Mrs. Gelman were speaking, using it for a different conversation, and then assigning a new line when their conversation resumed.  (See id. at 162-65.)   Furthermore, while he did not disagree with Owen that there was an increase in the *volume* of the 60-cycle hum, he did not perceive a change in its *frequency*, as Owen did, and concluded that the tape contained a continuous original recording.  (See id. at 167.)

Nonetheless, Reames agreed with the proposition that if one

---

[17] Mr. Owen was of the view that the fluid method of analysis provides more information.  (See H. Tr. at 94.)

were to find two different 60-cycle hum signatures on a tape, that would be a good indicator that the tape was a copy. (See id. at 200.)  And, the frequency analysis that he conducted resolved only to 10 hertz, while Mr. Owen's resolved at .5 hertz.  (See id. at 206.)  This allowed Owen to detect finer deviations in frequency.[18] Although Reames claimed to have done a higher resolution spectogram, he did not make a record of it or include it in his report. (See id. at 208-09.)  There is thus no way to test his conclusion that there is only one 60-hertz signature on the tape.

Notwithstanding Plaintiffs' failure to submit an expert report addressing the authenticity of Tapes 4 and 5, the Court allowed Dr. Reames to conduct an analysis of those tapes in anticipation of the hearing.  Reames agreed with Owens' conclusion that Tapes 4 and 5 were copies.  (See id. at 170.) In fact, Reames testified that by as early as March or April of 2007, he told Mr. Jung that Tapes 4 and 5 were not originals, and he was led to understand that Jung believed him.  Jung indicated that there had been "some kind of fire or flood or something at his house where the tapes were and perhaps he got them mixed up and did not realize."  (See id. at 185-89.)  Nevertheless, in a sworn affidavit Mr. Jung submitted to this Court in September of 2008, Mr. Jung asserted that Tapes 4 and

---

[18] According to Owen, the program that Reames used in analyzing the background frequency on the tape — Sound Forge — does not resolve  low enough to detect the .2 hertz change in frequency that Owen found. (See id. at 98.)

5 were not copies.  (See Jung Sept. 13 Aff. ¶ 3.)

In 2007, when he spoke to Jung, Reames estimated the cost of analyzing Tape 9 to be $8,000.00, and since Tapes 4 and 5 were substantially shorter, the cost of analyzing them would have been around $4,000.00.  However, Jung did not ask Reames to analyze Tapes 4 and 5, claiming that cost was an issue. (See id. at 188-90.)

C.   Continuation of Hearing

At the hearing on January 13, Plaintiffs provided a letter from Walter D. Bramson, M.D., dated January 12, stating, "[m]y patient, Jerry Jung was seen today, presenting symptoms of vertigo, elevated blood pressure and leg pain," advising that "[t]reatment and testing have been ordered to determine the cause of these symptoms," and concluding that Jung should "refrain from travel." (Letter from Walter D. Bramson, M.D., dated Jan. 12, 2009.) Plaintiffs requested a continuation of proceedings until such time as Mr. Jung could appear to testify.  The Court instructed Plaintiffs to submit "competent medical evidence of what his condition actually is," and specifically requested records "that indicate[] what tests were done and what the results were." (H. at Tr. at 239.)

The next day, Plaintiffs provided another letter from Dr. Bramson, which described Jung's symptoms related to vertigo and high blood pressure, and expressed the opinion that Jung was not

29

fit for air travel.  (Letter from Walter D. Bramson, M.D., dated
Jan. 13, 2009.)  On January 23, Plaintiffs' counsel stated in a
letter that Jung's "blood pressure remains high (190/110)," and
that he "had a[n] MRI of his brain which showed certain 'white
spots' which could be nothing but a neurologist will look at them."
(Letter from John R. Horan, Esq., dated Jan. 23, 2009 ("Horan Jan.
23 Ltr.").)  Plaintiffs next provided an affidavit from Dr. Bramson
that elaborated on the risks of air travel for Mr. Jung, and
indicated that Dr. Bramson had "arranged for testing and
treatment," but did not identify what tests were performed or what
the results were.  (See Declaration of Walter D. Bramson, M.D.,
dated Jan. 30, 2009.)

Pleading that Jung was "clearly not able to commit himself to
appear at this hearing in the foreseeable future," Plaintiffs
requested an adjournment "pending his recovery."  (Horan Jan. 23
Ltr.)  Defendants opposed the request.  Noting the absence of
clinical records setting forth test results for Jung, despite the
Court's request for these materials, as well as Plaintiffs' earlier
role in prolonging this litigation by violating discovery
obligations, the Court declined to grant an indefinite continuance,
and instead scheduled a second hearing date of February 19, 2009.
(See Order, dated Jan. 29, 2009.)  Jung still did not appear,
claiming that he continued to suffer from high blood pressure and
vertigo caused by Meniere's disease — which Plaintiffs did

30

ultimately document with an affidavit from an otolaryngologist, stating that Jung had been so diagnosed.  (See Declaration of Sharen Jeffires, M.D.)  Defendants contend that the circumstances surrounding Jung's failure to appear support the inference that he voluntarily absented himself from the proceedings.

Plaintiffs' attorney, John Horan, did testify at the continuation of the hearing, and he was cross-examined about what he knew about the production of the fabricated CT-scan and lab report.

## III. Relevant Law

Although Defendants rely upon Rule 37 in bringing their motion, the Rule is most relevant when a party fails to comply with a court order to produce discovery or fails to produce to an adversary relevant, requested information.   In the instant situation, where Defendants contend that Plaintiffs have committed fraud on the court by fabricating evidence and making misrepresentations to the Court, it is the Court's inherent authority that provides the primary basis on which to act.

> [Courts have] the inherent power to do whatever is reasonably necessary to deter abuse of the judicial process and assure a level playing field for all litigants. Indeed, "tampering with the administration of justice . . . involves far more than an injury to a single litigant.  It is a wrong against the institutions set up to protect and safeguard the public, institutions in which fraud cannot complacently be tolerated consistently with the good order of society."

Shangold v. The Walt Disney Co., No. 03 Civ. 9522 (WHP), 2006 WL

31

71672, at *4 (S.D.N.Y. Jan. 12, 2006) (quoting Hazel-Atlas Glass
Co. v. Hartford-Empire Co., 322 U.S. 238, 246, 64 S. Ct. 997
(1944)), aff'd, 275 Fed. Appx. 72, 2008 WL 1908908 (2d Cir. Apr.
28, 2008); see also Hargrove v. Riley, No. 04 Civ. 4587 (DGT), 2007
WL 389003, at *11 (E.D.N.Y. Jan. 31, 2007) ("If a party commits a
fraud on the court, the court has the inherent power to do whatever
is reasonably necessary to deter abuse of the judicial process.
Fraud upon the court has been defined as fraud which seriously
affects the integrity of the normal process of adjudication.")
(internal citations and quotation marks omitted); McMunn v.
Memorial Sloan-Kettering Ctr., 191 F. Supp. 2d 440, 445 (S.D.N.Y.
2002) ("[W]hen a party lies to the court and his adversary
intentionally, repeatedly, and about issues that are central to the
truth-finding process, it can be fairly said that he has forfeited
his right to have his claim decided on the merits."); cf. Patsy's
Brand, Inc. v. I.O.B., Inc., 317 F.3d 209, 222 (2d Cir. 2003)
(affirming a finding of contempt and award of attorneys' fees
against a party who submitted fraudulent evidence); West v.
Goodyear Tire & Rubber Co., 167 F.3d 776, 779 (2d Cir. 1999) ("Even
without a discovery order, a district court may impose sanctions
for spoliation [of evidence], exercising its inherent power to
control litigation."); Ostano Commerzanstalt v. Telewide Sys.,
Inc., 794 F.2d 763, 768 (2d Cir. 1986) (fabrication of evidence and
its introduction at trial "might well justify the imposition of

32

sanctions"); <u>Cerruti 1881 S.A. v. Cerruti Inc.</u>, 169 F.R.D. 573, 582-83 (S.D.N.Y. 1996) (entering judgment against a party who fabricated evidence, finding that "a federal court has inherent power to sanction a party for bad faith litigation conduct").

Nevertheless, in determining the appropriate sanction to impose, Rule 37 is the most pertinent point of reference. Under the Rule, the Court may issue such orders as are just, including orders of dismissal, default and preclusion. <u>See</u> Fed. R. Civ. P. 37(b) (2)(A).

Dismissal is a drastic sanction, which should be imposed sparingly. <u>See</u> <u>National Hockey League v. Metropolitan Hockey Club</u>, 427 U.S. 639, 642-43, 96 S. Ct. 2778, 2780-81 (1976) (per curiam); <u>Valentine v. Museum of Modern Art</u>, 29 F.3d 47, 49-50 (2d Cir. 1994) (per curiam) (in considering dismissal pursuant to Rule 37, stating that "[d]ismissal with prejudice is a harsh remedy to be used only in extreme situations . . . .") (internal citations omitted); <u>Civil v. New York City Dep't of Corr.</u>, No. 91 Civ. 2946 (SS), 1993 WL 51156, at *2 (S.D.N.Y. Feb. 23, 1993) (same).   However, where lesser sanctions would not be meaningful and the plaintiff's misconduct is due to "willfulness, bad faith, or any fault," dismissal of an action is appropriate. <u>National Hockey League</u>, 427 U.S. at 640, 643, 96 S. Ct. at 2779, 2781; <u>accord</u> <u>Simmons v. Abruzzo</u>, 49 F.3d 83, 88 (2d Cir. 1995).

As the <u>Shangold</u> court stated:

33

> In determining the appropriate sanction for fraud on the court, courts in this district have considered: (1) whether the misconduct was the product of intentional bad faith; (2) whether and to what extent the misconduct prejudiced the other party; (3) whether there is a pattern of misbehavior, rather than an isolated instance; (4) whether and when the misconduct was corrected; and (5) whether further misconduct is likely to continue in the future.

Shangold, 2006 WL 72672, at *4 (quoting McMunn, 191 F. Supp. 2d at 446) (internal quotation marks omitted); see also Hargrove, 2007 WL 389003, at *11 ("In order to grant sanctions based upon fraud, it must be established by clear and convincing evidence that a party has sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter by . . . unfairly hampering the presentation of the opposing party's claim or defense.").

## IV. Application to Plaintiffs' Conduct

The Court concludes that Plaintiffs must be sanctioned as a result of Mr. Jung's conduct. Jung, who had been a plaintiff in this action, and is the husband and father of the present Plaintiffs, concedes that he has managed the litigation on behalf of his family and has been funding the litigation. There is therefore no real dispute that his conduct is attributable to Plaintiffs.

Jung has represented to the Court and Defendants, on more than one occasion, that the tapes of his conversations with Mrs. Gelman, which were provided to, and relied upon by, Plaintiffs' experts,

were unaltered originals. His sworn testimony is that after each conversation, it was his practice to place the micro-cassette tape of the conversation in an envelope, on which he placed the date, and to store the envelope in a safe. Jung's most recent representation that the tapes are originals was made in his September 13, 2008 affidavit.

Jung has made various inconsistent statements about, among other things, the type of tapes he used, the dates on which certain conversations were taped, and whether or not he ever taped over conversations. He has never produced the envelopes in which the tapes were allegedly stored, which documented the dates of the taped conversations. Most significantly, however, it has now been established, by agreement of both Plaintiffs' and Defendants' experts, that at least the tape containing conversations 4 and 5 is not original. Moreover, we now know, through the testimony of the Jungs' own expert, that back in March or April of 2007, he advised Jung that Tapes 4 and 5 are not originals. According to Mr. Reames, Jung appeared to accept the likelihood of that conclusion. Yet, in his statements to the Court and Defendants, Jung continued to maintain that the tapes were originals.

There is no basis to conclude that this misrepresentation was anything but intentional. After being advised of his expert's conclusion, Jung not only continued to represent to the Court that Tapes 4 and 5 were original, but he also represented to the Court

35

that the only reason he did not have his expert do an analysis of
Tapes 4 and 5 was because the cost would have been prohibitive.
According to Jung, the cost of analyzing Tape 9 was $36,950.00, and
he was not prepared to spend that much money on Tapes 4 and 5.
Yet, Mr. Reames testified that he was never asked what the cost of
a forensic analysis would be, and had he been asked, he would have
estimated the cost at $4,000.00 to $5,000.00 for each tape. (H. Tr.
at 190.)[19]   The obvious explanation for why Jung did not submit an
expert analysis of Tapes 4 and 5 is that he knew they were not
originals.

As for Tape 9, the Court concludes that the weight of the
evidence supports Defendants' contention that it too is not an
original tape; to put it another way, Plaintiffs have not met their
burden of demonstrating that Tape 9 is original and authentic.
Both Plaintiffs' and Defendants' experts agreed that there is an
audible click in the tape at the point where there is a clipped
word.   Mr. Owen characterized these as indicators that something
out of the ordinary occurred on the tape.    At that same point in
the tape, Mr. Owen's magnetic imaging revealed a "pause" mark.   Mr.
Owen's spectographic analysis revealed that there was a significant
increase in the frequency of the background 60-cycle hum on the

---

[19] In 2007, when Reames analyzed Tape 9, and was not asked
to analyze Tapes 4 and 5, he actually estimated the cost of the
analysis to be $8,000.   The cost of analyzing Tape 9 later
increased substantially when Reames decided to use a more
expensive method of analysis. (See H. Tr. at 189-90.)

tape after the audible and visible anomaly, and he found that the hum almost doubled in amplitude. The .2 hertz differential in frequency is clear evidence that the portions of the tape occurring before and after that point were recorded at different places or times. Thus, the tape could not be an original recording of a continuous conversation.

Plaintiffs' expert was not able to competently refute Mr. Owens' finding about the increase in frequency of the 60-cycle hum on the tape — key evidence that the tape was not original. Although Mr. Reames conducted a spectographic analysis of the tape, the computer program he used — Sound Forge — does not resolve low enough to detect the .2 hertz change in frequency that Owen found. Moreover, although Reames claimed to have conducted a higher resolution spectogram of the tape, he did not make a record of it and has no printout or chart depicting its findings with respect to the frequency on the tape. Similarly, Reames was unable to identify the magnetic image derived from the tape at the point of the anomaly, where Mr. Owen found a pause mark.

The Court therefore concludes that, contrary to Plaintiffs' contention, Tape 9 is not an original.

While Plaintiffs attempt to minimize the significance of the tapes being copies, by cavalierly contending that there is no evidence that they were tampered with in any fashion or that they do not accurately represent the substance of the taped

conversations with Mrs. Gelman, the fact is that there is no way to determine whether the tapes were tampered with in the absence of the originals.   Both experts agreed, and the literature in the field confirms, that, in the absence of the originals, one cannot say with a reasonable degree of scientific certainty that the tapes contain accurate, unaltered copies of the recorded conversations.

Moreover, leaving aside the issue of whether the tapes can be properly authenticated so as to allow for their admission in evidence,[20] Plaintiffs appear to have little concern about the fact that they made misrepresentations to the Court and Defendants about

---

[20] Under Rule 901 of the Federal Rules of Evidence, "[t]he requirement of authentication . . . as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims."   Fed. R. Evid. 901(a).   Plaintiffs argue that a party may authenticate the voices on an audio recording by having a witness who made the recording testify about its creation and identify the speakers.   See Fed. R. Evid. 901(b)(5)(illustrating the rule for authentication with the example of identifying a voice on a "recording, by opinion based upon hearing the voice at any time under circumstances connecting it with the alleged speaker"); see also Rush v. Illinois Cent. R. Co., 399 F.3d 705, 722-23 (6th Cir. 2005) (holding that the voices on a recording had been properly authenticated as coming from the alleged speakers where the witness described how he made the tape and the speakers audibly identified themselves).   That is beside the point.   Here, the issue is whether the tapes are what Plaintiffs swore them to be: original recordings, and not copies.   Because the evidence shows the tapes are not "what [their] proponent claims," they cannot be authenticated.   Fed. R. Evid. 901(a). Moreover, to prove the content of a recording, the original of the recording is generally required.   See Fed. R. Evid. 1002. Because Plaintiffs do not have the original recordings, and thus "a genuine question is raised as to the authenticity of the original[s]," the "duplicates" that Plaintiffs have submitted as Tapes 4, 5 and 9 are not admissible.   Fed. R. Evid. 1003.

the tapes.   That the tapes are not originals presents more than merely an evidentiary question.

This issue is presented even more starkly with the submission of the purported CT scan and radiology report that appears to depict Mrs. Gelman's Alzheimer's disease in August of 1993, just days before she amended her Mexican Will, and a few months after she amended her New York Will.   The Court has no difficulty in concluding that the 1993 CT scan and report are fabricated, and Plaintiffs have conceded that they are in no position to refute this conclusion.   It has been established that the laboratory where the scan appears to have been taken did not come into existence until 1999.   Moreover, the telephone number of the laboratory, on the letterhead of the report, contains eight digits, but eight-digit telephone numbers were not instituted in Mexico until 1999.

The more troubling and difficult question is whether Mr. Jung knew or should have known that the report was fabricated when he submitted it to his experts and Defendants, knowing that it would be used as evidence before this Court.

Jung contends that in mid-August 2007, he received a call from Mr. Sebastian, a relative of Mrs. Gelman, in which Sebastian told him that he had an "x-ray" of Mrs. Gelman and some other documents that he thought Jung would find interesting.   Sebastian was told to take the documents to Jung's Mexican attorney, who then sent it to Jung's son in New York, who appears to have then sent it to his

39

father in California, who later provided it to his attorney in this action, John Horan, whose office is in New York. (See Jung Aff. ¶ 2.)   Mr. Horan could not explain why the CT scan and report took this convoluted route. (See H. Tr. at 333.)

Jung stated in his affidavit that since the CT scan "appeared to be what it was, as did the report, [he] made no independent inquiry about it." (Id.)    Yet, these documents were far from ordinary.  Litigation about Mrs. Gelman's testamentary capacity in 1992 and 1993 has been going on in various fora for over ten years. In that litigation, Jung, and private investigators and attorneys he had retained, had been searching for any medical evidence relating to Mrs. Gelman's testamentary capacity in the period of 1991 through 1993, and their search included speaking to her primary care physician in Mexico; despite their extensive efforts, they found no objective medical evidence that is as pertinent as the CT scan and report purport to be.  (See H. Tr. at 319.)   That fact alone renders Jung's casual attitude about the CT scan and report dubious.

There is more, however, that strongly suggests a reason to have questioned the authenticity of these documents.   Sebastian, the source of these documents, was no stranger to Jung.  He entered objections to Mrs. Gelman's New York Will, and both he and Jung were deposed in the New York proceeding.   Sebastian testified, in 1999, that he had neither seen nor spoken to Mrs. Gelman since at

40

least 1985 or 1986, more than a decade before she died.  Similarly, Jung testified in the New York proceeding that he knew that Sebastian had not been in contact with Mrs. Gelman since 1985 or 1986. (See id. at 325.)  Because Jung knew that Sebastian had been estranged from Mrs. Gelman and had not seen her since 1986, and he clearly was not an executor of her estate, his claiming to have found a CT scan and report from 1993, pertaining to Mrs. Gelman, in Mrs. Gelman's papers or files, would have been viewed by any reasonable person as highly suspect and deserving of investigation. Yet, Jung claims to have had no reason to question Sebastian's assertion, and, without any further investigation, he and his attorney simply sent the documents to his experts for them to rely upon.[21]

Jung's inexplicable failure to inquire further into the circumstances under which the documents were purportedly discovered and created suggests willful ignorance or knowing complicity,

_____

[21] Jung's counsel exercised as little concern as his client over the origin and authenticity of the documents. He never spoke to Sebastian about the documents, and neither he nor Jung thought to ask Sebastian how he suddenly came into possession of documents belonging to someone who had died ten years earlier. (See H. Tr. at 338-39.) Nor did he attempt to contact the laboratory where the scan was supposed to have been taken, the doctor who took it, or any other doctor who had been known to have treated Mrs. Gelman.  Moreover, in violation of their obligations under the discovery rules, Plaintiffs failed to produce the documents to Defendants for months, until shortly before Sebastian died.  This precluded Defendants from investigating the circumstances under which the documents came to light.

rather than simple carelessness or indifference. Defendants point out that Jung and Sebastian were also both parties to a lawsuit instituted in Mexico City, in September 2006, concerning Mrs. Gelman's Mexican Will.  They had a common interest in contesting the terms of her Amended Will.[22]   Sebastian and Jung had also contested the probate of Mrs. Gelman's New York Will, eight years earlier.  Sebastian did not offer the CT scan and report in the New York proceeding, and it should have been obvious that he would have had no means of access to such a report in the intervening eight years.  Even if Sebastian actually did send the documents to Jung — a proposition that this Court has ample reason to question — it is clear that he fabricated them, either alone or in concert with others.

That Jung and his counsel did not look into the circumstances of Mrs. Gelman's purported CT scan, even as a way of buttressing their own case, nor seek out records from the doctor who purportedly ordered the scan, provides further reason to question

---

[22] In October 2006, Jung advised the Mexican court of Mr. Sebastian's existence, and Mr. Sebastian joined the litigation in December 2006.  Mr. Sebastian subsequently sold his hereditary rights to Jerry Jung's Mexican lawyers for $20,000, in October 2007, and he died in January of 2008.  (See Declaration of Jose Antonio Garcia Luque, dated Sept. 25, 2008 ("Garcia Luque Decl."), at 3.)  Defendants argue that it should have been highly suspicious that Mr. Sebastian would enter a lawsuit over Mrs. Gelman's Will in December 2006, and wait until August of 2007 to disclose to Mr. Jung documents that he had that bore on one of the central issues in the litigation.

42

their belief in its authenticity.  Even when they were prodded into investigating the documents in response to Defendants' motion, they failed to follow through.  After striking a tone of righteous indignation at the "scurrilous" accusation that the CT scan report was fraudulent (see Horan Aug. 8 Ltr.), Plaintiffs' counsel, Mr. Horan, left the investigation to his client, who claims to have asked his Mexican attorneys "to investigate the report and the allegations made by counsel." (Defts.' Ex. B-6 ¶ 2.)  On August 28, 2008, Mr. Horan declared, "Proof that the CT scan is not fabricated must come from Mexico; I am informed that Mexican counsel is preparing a response now." (Horan Aug. 8 Ltr.)  On September 15, he stated, "I have requested an immediate response about the scan and lab report from Mexican counsel to Jerry Jung, but because they were on holiday in mid August, I have yet to receive information sufficient to respond." (Horan Aff. ¶ 5.)   Yet, several weeks later, on September 30, he informed the Court that "Mr. Jung's investigators and lawyers, and his financial resources in Mexico, have been concentrating on the prosecution of a major case against defendant Littman, the former executor of the estate of Natasha Gelman.  They have not had sufficient time and funds to investigate the CT scan allegations.  I cannot predict when they will be able to report." (Letter from John Horan, Esq., dated Sept. 30, 2008.)

To date, approximately six months after Defendants first alleged the CT scan report was fabricated, the Court has not

43

received further information on Mexican counsel's investigation of the report.  Presumably, Mr. Horan has not either.  In fact, at the hearing, he conceded that he never even spoke to Jung's Mexican counsel, but left that to Jung.  (See H. Tr. at 327-29.)

The false representations to the Court did not end there. After Defendants undertook their investigation, and determined, with not much effort, that the CT scan and report had to have been fabricated, and they submitted their motion seeking sanctions, Plaintiffs did not simply accede to the obvious.   Instead, Plaintiffs attempted to maintain the position that the CT scan and report were authentic by submitting an affidavit from Mario Moreno — a person who is no stranger to deception.  Moreno is the adopted son of Mario Moreno a/k/a "Cantinflas," the well-known Mexican actor, who was also a business partner of Jacques Gelman.  Moreno was the executor of Cantinflas's estate. (See Parver Reply Aff. ¶ 19; see also testimony of Steven J. Hyman, Esq., H. Tr. at 52.)  In litigation against Columbia Pictures over the ownership of the Cantinflas films, the United States District Court for the Central District of California found that an agreement offered in evidence by Moreno, purporting to transfer title to twenty motion pictures, was signed three years after title to the pictures had already been transferred, was not corroborated by any other documents, and was, in fact, contradicted by dozens of documents. (See LaParade v. Columbia Pictures Industries, Inc., 97 Civ. 0615 (C.D. Cal.),

44

Findings of Fact and Conclusions of Law ("LaParade Findings"),
Hyman Aff., Ex. B, at 10-11.) Additionally, Moreno's testimony
"was contradictory regarding the circumstances under which this
agreement was located." (Id. at 10.) In short, the court found
the document submitted by Moreno "to not be reliable, credible
evidence." (Id. at 11.) Moreover, Moreno was found to be in
contempt of an injunction entered by the court, and an order was
issued for his arrest. (See Hyman Aff. Ex. C.) Thereafter, he was
found in contempt by another federal judge, who also issued a
warrant for his arrest. (See Hyman Aff. Ex. D.) When he appealed
to the Ninth Circuit, the court dismissed his appeal, finding that
he was a "fugitive from justice." (See LaParade v. Ivanova, 116
Fed. Appx. 100, 2004 U.S. App. Lexis 23471 (9th Cir. Nov. 5, 2004),
Hyman Aff. Ex. E.)[23]

Jung, in all likelihood, solicited the statement from Moreno
in which he claims to be Mrs. Gelman's godson.[24] Moreno states that

---

[23] Mr. Moreno also testified in the Mexican proceeding that
Jerry Jung was the only living relative of Natasha Gelman, with
the possible exception of an illegitimate child no one had ever
seen. (See Stipulation, Defts.' Ex. F, ¶ 9.) In fact, Mrs.
Gelman had a half-brother, Mr. Sebastian, who entered an
appearance in the Mexican proceeding and was found to be the sole
intestate heir of Mrs. Gelman. (See id. ¶¶ 8, 12, 13.) As
discussed above, he sold his hereditary rights to an attorney in
the firm representing Mr. Jung.

[24] When Plaintiffs first submitted Moreno's statement in
September, it was unsworn. Plaintiffs' counsel stated that "I am
told that Mr. Moreno will send a completed sworn statement to me
later this week." (Horan Aff. ¶ 5.) Five months passed before
Plaintiffs' counsel did finally provide the sworn statement, at

45

in early August of 1993, he went to Mrs. Gelman's apartment in Cuernavaca and was troubled by her mental deterioration. He therefore made an appointment with Dr. Guiillermo Chavez for a CT scan. He purports to recall that on or about August 15, 1993, he took Mrs. Gelman for the CT scan procedure. (See Defts.' Ex. B-7, Ex. C.)

Leaving aside the patent falsity of having taken Mrs. Gelman for a CT scan with a doctor who states that he never took such a scan, and at a laboratory that did not exist until six years later, Jung should have recognized that, on its face, the statement was extremely dubious. Moreno, apparently at Jung's behest, was purporting to recall an event that occurred fifteen years earlier. Yet, at a much more proximate time, in 2000, when Moreno submitted an affidavit in support of Jung's challenge to the probate of Mrs. Gelman's Will, he mentioned nothing about such a doctor's visit. (See Parver Reply Aff. Ex. 5.) He professed dismay that Mrs. Gelman "did not know him" when they spoke on the telephone in April 1993, and that thereafter, she was not sufficiently lucid to converse with him, either on the telephone or when he visited her in Cuernavaca in 1994. (Id. ¶¶ 9-10.) Nowhere did he mention even seeing Mrs. Gelman in 1993, no less taking her for a CT scan, or looking into the results of the scan — something one would assume

---

the Court's request, after the Court learned at the February 19 hearing that counsel had received the sworn statement and had simply forgotten about it. (See H. Tr. at 346-47.)

would occur if he was so concerned about her mental health.

Mr. Jung has devoted much of his attention to litigating these matters for approximately ten years. (See H. Tr. at 357-59.)  There is every reason to believe that he has an intimate knowledge of the evidence that has been submitted in support of his claims.  Yet, neither he nor his attorney thought there was any reason to question a clearly improbable statement by Moreno recalling that fifteen years earlier he took Mrs. Gelman for a CT scan.  Moreover, any notion that he believed the statement to be plausible is belied by the fact that neither he nor his attorney tried to speak to either the doctor purported to have ordered the procedure or the doctor purported to have authored the report.

\* \* \* \*

The Court concludes that these facts establish clear and convincing evidence that: 1) Mr. Jung made false statements to the Court and Defendants that the tapes he produced of conversations with Mrs. Gelman are original and authentic; 2) Plaintiffs submitted false evidence to the Court and Defendants in the form of (a) the 1993 CT scan and report, (b) Sebastian's claim that he found the scan and report in Mrs. Gelman's papers, and (c) Moreno's statement about taking Mrs. Gelman for a CT scan; 3) Plaintiffs either knew or should have known that the documents and statements they were submitting were false, and of such questionable veracity and authenticity, in light of earlier contradictory testimony by

47

these witnesses, that further investigation was required before offering them in evidence in a court proceeding; 4) although the Court cannot say that there is clear and convincing evidence that Mr. Jung was actively involved in creating the false evidence (the Court does not rule it out), he clearly facilitated a fraud on the Court by both choosing to ignore obvious evidence of falsity and soliciting the statement from Mr. Moreno.  This conduct is clearly sanctionable.

The Court also finds troubling the degree to which Mr. Horan has abdicated his responsibility as an attorney and officer of the court.  Although the Court has not concluded that it is necessary to sanction Mr. Horan personally, it is clear that he has taken a "hands-off" "hear-no-evil, see-no-evil" attitude to the submission of evidence to the Court, leaving it to his client, who has demonstrated questionable integrity,[25] to "develop" evidence and

_____

[25] At his deposition in this action, Mr. Jung acknowledged that he received, among others, a check in the amount of $24,600.00 from Mrs. Gelman, payable to the Robert Louis Stevenson School, a boarding school that Mr. Jung told Mrs. Gelman his daughter would be attending.  His daughter did not end up attending the school, but Mr. Jung retained the check, established a d/b/a and bank account in the name of Jerry Jung for the Robert Louis Stevenson Music School, and then cashed the check and used it to purchase a piano.  He never told Mrs. Gelman or the person supervising her financial affairs that he did not use the check for his daughter's schooling. (See Defs.' Ex. D-30, at 27-29.)   The Jungs received another check from Mrs. Gelman in the amount of $3,800.00, for their daughter's attendance at the Robert Louis Stevenson school.  Again, she did not attend the school, but the Jungs kept the check and deposited it in their own bank account. (See Defts.' Ex. D-31 at 47-52.)

48

undertake "investigations" into the truthfulness of evidence submitted to the Court.

**V. Remedy**

Defendants seek the ultimate sanction of dismissal, arguing that Plaintiffs' submission of fabricated evidence has been willful and in bad faith; that it has prejudiced Defendants because of the expense and resulting delay incurred in investigating the evidence and litigating the motion; that it is part of a pattern of discovery misbehavior, including misrepresentations and conflicting representations about the audiotapes; that the misconduct has not been corrected; and that lesser sanctions would not be meaningful, because the Court previously imposed the lesser sanctions of awarding Defendants attorneys' fees and costs and precluding the use of evidence by Plaintiffs, yet Plaintiffs' misconduct continued. See Shangold, 2006 WL 72672, at *4 (explaining that courts determining an appropriate sanction consider whether a party exhibited "intentional bad faith," whether the opposing party is prejudiced, whether there is a pattern of misbehavior, whether the party took remedial measures, and whether misconduct is likely to continue) (quoting McMunn, 191 F. Supp. 2d at 446) (internal quotation marks omitted).

For their part, Plaintiffs maintain an attitude of "no harm no foul." They argue that they did not know that the CT scan and accompanying report were fabricated and have been prepared to

stipulate to their exclusion.   To the extent that their experts relied on the scan and accompanying report, they can now disregard them and amend their reports, if necessary.   Plaintiffs contend that the experts and other witnesses can be cross-examined at trial about the evidence in issue, and the triers of fact can determine to what extent the evidence influenced the experts' opinions and what weight, if any, they should give to their opinions. Similarly, with regard to the tapes, Plaintiffs claim that there has been no willful fabrication, and it is for the triers of fact to determine whether the conversations on the tapes have been altered and what weight to accord them.

Mr. Jung, and, by extension, Plaintiffs, have been either intentionally dishonest or recklessly indifferent to the truth in dealing with Defendants and the Court.   Most seriously, he misrepresented that the audiotapes were originals and it has now been established that they are copies; he either knew or should have known that the CT scan and report were not authentic, yet he proffered them in evidence; he either knew or should have known that Mr. Moreno's statement about taking Mrs. Gelman for a CT scan in 1993 was false.   In the face of this misconduct, the mere exclusion of the fabricated evidence amounts to no sanction at all. See Pope v. Federal Express Corp., 138 F.R.D. 675, 683 (W.D. Mo. 1990), aff'd in part, vacated on other grounds, 974 F.2d 982 (8th Cir. 1992) ("Litigants would infer they have everything to gain,

50

and nothing to lose, if manufactured evidence merely is excluded while their lawsuit continues.")

"The Court has the inherent power to do whatever is reasonably necessary to deter abuse of the judicial process and assure a level playing field for all litigants." Shangold, 2006 WL 71672, at *4. As noted, however, fraud on the court must be established by clear and convincing evidence, and the harsh sanction of dismissal is "not to be utilized without a careful weighing of its appropriateness" in light of lesser sanctions. Id. "Because dismissal sounds the death knell of the lawsuit, district courts must reserve such strong medicine for instances where the defaulting party's conduct is correspondingly egregious." Aoude v. Mobil Oil Corp., 892 F.2d 1115, 1118 (1st Cir. 1989) (internal quotation marks omitted). "It is well-settled . . . that an isolated instance of perjury, standing alone, will not constitute a fraud upon the court." McMunn, 191 F. Supp. 2d at 445. Therefore, courts have generally reserved the sanction of dismissal for those cases where "a party lies to the court and his adversary intentionally, repeatedly, and about issues that are central to the truth-finding process." Id.; accord Shangold, 2006 WL 71672, at * 4.

The Court has seriously considered recommending that this action be dismissed. In the best light, Plaintiffs have demonstrated a cavalier attitude about the accuracy of statements

51

they make and evidence they submit to the Court. Their misrepresentations and submissions have resulted in enormous expense to Defendants and have consumed a great deal of the Court's time. Yet, as troubling as their conduct has been, it does not rise to the level of malfeasance in other cases where dismissal was determined to be appropriate. For example, in <u>Hargrove</u>, the prisoner plaintiff, who was required to demonstrate that he had exhausted institutional grievance procedures, submitted in evidence eight letter-complaints, seventeen sick call requests, and nine grievance forms, many of which had falsified notarizations and most of which were demonstrated to be forged or copied, with only the dates changed. <u>See Hargrove</u>, 2007 WL 389003, at **3-4, 11. In <u>Shangold</u>, the plaintiffs fabricated a timeline and plot summary for a proposed theatrical feature, which was central to their claim of copyright infringement, in an attempt to demonstrate that they created a storyline prior to its purported copying by the defendant, and bolstered the fabrication with perjurious testimony. The court concluded that the plaintiffs' "egregious conduct was prolonged and calculated to advance their claims. Even . . . in the face of indisputable evidence, Plaintiffs [did] not relent." <u>Shangold</u>, 2006 WL 71672, at **3-5. And in <u>McMunn</u>, the plaintiff lied repeatedly at her deposition, destroyed potentially critical evidence, lied repeatedly in order to conceal the location of a witness, edited tapes so that they would be more favorable to her

52

case than the unedited originals, engaged in a sham real estate transaction to increase her damages, and made no attempt to correct her deceptive conduct. See 191 F. Supp. 2d at 454, 458, 460, 462.

In this action, the only proven misrepresentation that Jung made directly was that Tapes 4-5 and 9 were originals, and they have turned out to be copies. Although, without originals, it is not possible to confirm that alterations were not made in the taped conversations, there is no clear and convincing evidence that Plaintiffs edited the content of the conversations to make them more favorable to their claims. Moreover, these tapes, unlike, for instance, the timeline in Shangold, are not the "linchpin" of Plaintiffs' theory of liability. See id. at *3. There, the plaintiffs cited the timeline in their complaint, and relied on it to establish that they had created the protected content at issue prior to the defendants. See id. In other words, it is unlikely they would have been able to assert any claim for copyright infringement without the timeline. See also Pope v. Federal Express Corp., 138 F.R.D. 675, 683 (W.D. Mo. 1990) (dismissing a case where "plaintiff knowingly advanced a document which she knew was not what she represented it to be, and that she relied upon . . . in her pleadings"), remanded on other grounds, 974 F.2d 982 (8 Cir. 1992). Here, there is an extensive record beyond the tapes, and the extent to which Plaintiffs' experts relied on these tapes in reaching their conclusions about Mrs. Gelman's mental capacity

has not yet been explored. Indeed, their reliance on any tapes provided by Jung will only serve to undermine their opinions and Plaintiffs' case before a jury.

As for the CT scan and report, Jung claims that they were sent to him by a relative of Mrs. Gelman, and he provided them to his experts assuming that they were what they purported to be. While the Court has concluded that, at a minimum, Jung either knew they were inauthentic or should have been skeptical of their authenticity, the Court is unable to conclude that Jung himself participated in creating the documents. Similarly, Mr. Moreno's statement about taking Mrs. Gelman for the CT scan, while false, was not made by Jung, although the Court believes that Jung knew or should have known it was false.

As with the tapes, while the CT scan and report would have been extremely favorable to Plaintiffs' case if authentic, they are not essential to their claims. They were neither "relied upon . . . in [Plaintiffs'] pleadings," Pope, 138 F.R.D. at 683, nor necessary for Plaintiffs to state a claim against Defendants, see Shangold, 2006 WL 71672, at **3-5, such that the Court could conclude that they concocted a basis for bringing suit in the first place. Furthermore, although Plaintiffs submitted the statement from Moreno to rebut Defendants' attack on the authenticity of the CT scan and report, Plaintiffs did, ultimately, relinquish their reliance on those documents. Their conduct is thus distinguishable

from that of plaintiffs in cases warranting dismissal who "repeatedly attempted to promote the use of [a false] document" that they "knew . . . was manufactured," see Pope, 138 F.R.D. at 683, or refused to "relent" in "the face of indisputable evidence," see Shangold, 2006 WL 71672, at *5.

The CT scan and report will not be placed in evidence before the triers of fact, and, as with the tapes, it has not yet been determined to what extent Plaintiffs' experts relied upon these documents in forming their opinions. Again, any reliance by the experts on these fabricated documents will only serve to undermine Plaintiffs' case.

A final factor militating against dismissal as a sanction, at this point, is that the Court has not had an opportunity to assess Mr. Jung's credibility on these matters in the way that credibility is normally assessed — directly, by listening to the witness under cross-examination and viewing his demeanor. Defendants have asked the Court to draw an adverse inference from Mr. Jung's absenting himself from the hearing. While sorely tempted to do so, Mr. Jung's doctors have submitted letters containing their recommendation that he not travel because, among other things, of his extreme dizziness, likely resulting from Meniere's disease. The Court shares Defendants' skepticism about Jung's absence from

the hearing,[26] but, without contradicting evidence, cannot simply disregard his physicians' diagnosis and recommendation.

Finally, although it is true that this is not the first instance of sanctionable conduct by Mr. Jung, the previous sanctions did not result from the submission of fabricated evidence or fraudulent statements to the Court.

In the end, the numerous questions Defendants have raised about Jung's credibility are best decided by the triers of fact, who will have an opportunity to see and hear Jung. There are severe, but lesser sanctions than dismissal, that can appropriately address Plaintiffs' misconduct.

The Court therefore recommends the following:

1) Plaintiffs' experts have relied on the transcripts of four audio recordings provided to them by Jung. In light of the fact that the Court has determined that Jung lied about whether two recordings he made were originals, and that a third could not be authenticated as original despite being represented as such, Plaintiffs should be precluded from affirmatively relying on the content of any of the four recordings from Jung cited in their experts' reports. In this respect, the Court notes that "[a] district court has broad discretion for crafting a proper sanction." West, 167 F.3d at 779-80 (noting that the district

---

[26] For the most part, it appears that Mr. Jung's doctor's diagnosis and recommended avoidance of travel have been premised upon Mr. Jung's self-reported, subjective symptoms.

court could have "precluded [the plaintiff] from offering evidence on . . . issues" on which Plaintiff had allowed spoliation of relevant evidence). Plaintiffs have misrepresented the nature of Jung's recordings to advance their claims. Although preclusion of evidence about a particular topic is normally used in cases of spoliation, which did not occur here, the need for an appropriate "less drastic" measure than dismissal is necessary to further the deterrent purpose of sanctioning abuse of the judicial process. See id. at 789 (citations omitted); Shangold, 2006 WL 71672, at *4. The Court concludes that precluding reliance on any of Jung's recordings is the most effective way to do so. Defendants should not be put to the further expense of having to independently test the authenticity of recordings other than Tapes 4, 5, and 9 on which Plaintiffs' experts relied. [27]

2) Plaintiffs should be precluded from using as affirmative evidence the 1993 CT scan and report.

3) Plaintiffs' experts should not be permitted to amend their reports to take into account the precluded evidence.

4) The District Court should inform the jury that Plaintiffs provided to their experts and Defendants, and planned to offer in evidence, fabricated documents regarding Mrs. Gelman's mental

---

[27] Precluding the use of Jung's recordings is also less severe than the primary alternative to dismissal proposed by Defendants: the preclusion of any use of expert reports by Plaintiffs.

capacity; that Plaintiffs either knew or should have known that the documents were fabricated; and that the jury may consider these facts in assessing what weight to accord Plaintiffs' experts' opinions. See Rybner v. Cannon Design, Inc., No. 95 Civ. 0279 (SS), 1996 WL 470668, at *6 (S.D.N.Y. Aug. 20, 1996) ("defendants will be permitted to inform the jury of the dishonesty and a jury charge will be given that any falsehood under oath should be considered seriously by jurors in assessing [plaintiff's] credibility"); Bernal v. All American Investment Realty, Inc., 479 F. Supp. 2d 1291, 1293-94 (S.D. Fla. 2007) ("At trial, the Court shall also instruct the jury as to [the defendant's] spoliation of evidence and procurement of false evidence, which they may consider in assessing his credibility."). This would not preclude Defendants, should they choose, from submitting evidence of Mr. Jung's role in the submission of the documents.

5) The District Court should inform the jury that at least three audiotapes Plaintiffs provided to their experts and Defendants, and planned to offer in evidence, were claimed to be originals but had been determined to be copies; that it has not been ascertained whether any other tapes are originals or copies; that, without the originals, it is not possible to ascertain whether there were alterations in the tapes or their transcriptions; and, that the jury may consider those facts in assessing what weight to accord Plaintiffs' experts' opinions.

6) The District Court should inform the jury in its jury charge that the jurors should consider the submission of the fabricated evidence and representations about the authenticity of the tapes in assessing Mr. Jung's credibility on other matters, and in determining the reliability of any materials he provided to Plaintiffs' experts.   See Rybner, 1996 WL 470668, at *6; Bernal, 479 F. Supp. 2d at 1293-94.

7) Defendants should be awarded the attorneys' fees and costs they incurred in establishing that the CT scan and report were fabricated and that Tapes 4, 5, and 9 are not original.   Proof of these expenses should be submitted within fourteen (14) days of the District Court's decision with respect to this Report and Recommendation.                                              .

The Court previously imposed sanctions on Plaintiffs in the amount of $216,926.51, of which only $72,272.50 has been paid.   The Court recognizes that payment of the remainder, plus the sanctions resulting from this decision, which are likely to be at least as substantial, may be burdensome to Plaintiffs.   Nevertheless, precisely because the amount will be substantial, Defendants should not be required to await payment until the conclusion of this litigation.   If Plaintiffs intend to proceed with this action, payment should be made in full before the filing of any dispositive motions and, certainly, before trial.   Otherwise, Plaintiffs will have no incentive to make payment, leaving Defendants in the

position of having to pursue Plaintiffs for payment of the sanctions in the event Defendants prevail at trial. In addition, Plaintiffs should be required to pay the remaining amount of the original sanction owed to Defendants by no later than March 31, 2009.

\* \* \* \*

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have ten days from service of this Report to file written objections. <u>See also</u> Fed. R. Civ. P. 6(a) and (d). Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable Richard M. Berman, and to the chambers of the undersigned, Room 1660. Any requests for an extension of time for filing objections must be directed to Judge Berman. Failure to file objections will result in a waiver of those objections for purposes of appeal. <u>See</u> <u>Mario v. P & C Food Mkts., Inc.</u>, 313 F.3d 758, 766 (2d Cir. 2002); <u>Spence v. Superintendent</u>, 219 F.3d 162, 174 (2d Cir. 2000); <u>Small v. Sec'y of Health and Human Servs.</u>, 892 F.2d 15, 16 (2d Cir. 1989) (per curiam).

Respectfully submitted,

_____
THEODORE H. KATZ
UNITED STATES MAGISTRATE JUDGE

Dated: March 6, 2009
      New York, New York